IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
|  | : | Case No. 1:10-cv-849 |
|  | : |  |
| ANTHONY YOUNGER, *et al.*, | : | Chief Judge Susan J. Dlott |
|  | : |  |
| Plaintiffs, | : | ORDER DENYING PLAINTIFFS' |
|  | : | MOTION FOR SUMMARY |
|  | : | JUDGMENT (Doc. 56); GRANTING IN |
| v. | : | PART DEFENDANT'S MOTIONS |
|  | : | FOR SUMMARY JUDGMENT (Docs. |
|  | : | 53, 54); DENYING DEFENDANT'S |
| INGERSOLL-RAND COMPANY, et al., | : | MOTION TO STRIKE PLAINTIFFS' |
|  | : | HARASSMENT CLAIM (Doc. 61); and |
| Defendants. | : | DENYING AS MOOT THE |
|  | : | REMAINING MOTIONS TO STRIKE |
|  | : : | (Docs. 69, 70, 78, 82) |

In this lawsuit, Plaintiffs Anthony Younger, an African-American male, and Lee Gillett, a

Jewish Caucasian male, allege state law claims of employment discrimination (on the basis of

race, religion, and national origin), retaliation, and intentional infliction of emotional distress

against Defendants Ingersoll-Rand Company (hereinafter "Steelcraft") and three unnamed John

Does.[1]  (Doc. 2.)   Plaintiff Younger additionally raises claims of employment discrimination and

retaliation under Title VII of the Civil Rights Act of 1964.   (*Id.*)   As explained in greater detail

below, there is a large rift between the parties' reading of Plaintiffs' Complaint, in particular with

---

[1] Plaintiffs have not amended their Complaint to identify the John Does.   Accordingly,
the Court dismisses all claims against those Defendants.   *See Pruitt v. Lewis*, No. 06-2867, 2007
WL 4293037 (W.D. Tenn. Dec. 6, 2007) (dismissing claims against unnamed defendants where
the discovery deadline had passed and the plaintiff failed to use the discovery process to determine
the names of the unidentified defendants); *Motley v. Wendy's Old Fashion Hamburgers, Inc.*, 2007
WL 3226973, No. 1:05 CV 2506 (N.D. Ohio Oct. 30, 2007) (dismissing claims against three John
Doe defendants where the plaintiffs did "nothing during the more than two years that [the] action
[was] pending to identify these John Doe officers, amend their complaint with that identifying
information, and then properly serve the identified officers"); *Scott v. City of Dayton*, No.
C-3-04-420, 2007 WL 1875642 (S.D. Ohio June 28, 2007).

regard to the nature of Plaintiffs' discrimination claims.   The Court ultimately construes Plaintiffs' Complaint as stating two different types of discrimination claims under Ohio and federal law: (1) disparate treatment discrimination related to specific adverse employment actions and (2) hostile work environment claims related to an alleged ongoing pattern of discrimination and harassment on the part of Plaintiffs' co-workers and supervisors.

Presently before the Court are the following motions for summary judgment:

• Defendant Steelcraft's Motion for Summary Judgment on the Claims Asserted by Plaintiff Anthony T. Younger (Doc. 53);

• Defendant Steelcraft's Motion for Summary Judgment on the Claims Asserted by Plaintiff Lee S. Gillett (Doc. 54);

• Plaintiffs' Motion for Summary Judgment (Docs. 56, 57).

Also before the Court are the following related motions to strike:

• Defendant Steelcraft's Motion to Strike Plaintiffs' Harassment Claim and the Allegations of Discrimination That Were Neither Witnessed Nor Known of By Plaintiffs (Doc. 61) (hereinafter "Motion to Strike Plaintiff' Harassment Claim");

• Defendant Steelcraft's Motion to Strike Paragraphs 5–8 and 15 of Plaintiff Anthony T. Younger's Sworn Affidavit and Related Arguments Contained in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Doc. 69) (hereinafter "Motion to Strike Portion of Younger Affidavit");

• Defendant Steelcraft's Motion to Strike Paragraphs 12 and 13 of Plaintiff Lee Gillett's Sworn Affidavit and Related Arguments Contained in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Doc. 70) (hereinafter "Motion to Strike Portion of Gillett Affidavit");

• Plaintiffs' Motion to Strike Defendant's Motion to Strike Plaintiffs' Harassment Claim and the Allegations of Discrimination That Were Neither Witnessed Nor Known of By Plaintiffs (Doc. 78) (hereinafter "Plaintiffs' Motion to Strike Defendant's Motion to Strike Harassment Claims");

• Plaintiffs' Motion to Strike Pages 9, 10, 11, and 12 of Defendant's Motion to Strike Anthony Younger's Sworn Affidavit (Doc. 82).

The Court held a hearing on all of the above-listed motions on January 7, 2013. For the reasons that follow, the Court **DENIES** Defendant's Motion to Strike Plaintiffs' Harassment Claim (Doc. 61) and **DENIES AS MOOT** all other motions to strike (Docs. 69, 70, 78, and 82.) The Court also **DENIES** Plaintiffs' Motion for Summary Judgment (Doc. 56) and **GRANTS** summary judgment to Defendant as to all of Plaintiffs' claims except for Plaintiffs' hostile work environment claims.

I.      **BACKGROUND**

In the briefing related to the summary judgment motions, Plaintiffs focus on allegations that their supervisors and co-workers engaged in and condoned a pattern and practice of discrimination and harassment against African-American and Jewish employees, whereas Defendant focuses on a different set of facts related to adverse employment actions taken against each Plaintiff. Because the nucleus of relevant facts differs significantly from claim to claim in this case, the Court saves a detailed discussion of those facts for the analysis of each claim in order to avoid repetition in an already lengthy opinion. Accordingly, this section provides only basic information regarding Plaintiffs' employment with Steelcraft and the organization and management of the Steelcraft plant in Blue Ash, Ohio where both Plaintiffs worked during the time frame at issue.

Plaintiff Younger has been employed by Steelcraft since 2000 and continues to work at the Blue Ash plant. (Younger Dep. 7, 11, Page ID # 4546, 4550;[2] Younger Aff. ¶ 3, Page ID # 2214.) During the course of Younger's employment, he has had several different immediate supervisors,

---

[2] The complete transcript of Younger's deposition can be found at CM/ECF Doc. 100.

also referred to as "team leaders," including but not limited to Jeff Privett,[3] Scott Durbin, and Karl Busam, all of whom are Caucasian. (Younger Aff. ¶¶ 4, 10, Page ID # 2214–15.)

Gillett was employed by Steelcraft from November 2000 through October 2009, when he was terminated as a result of violating Steelcraft's attendance policy. (Gillett Dep. 16, Page ID # 4678.) Gillett worked in the same department as Younger during the last five years of his employment. (*Id.* at 58, Page ID # 4720.) At the time of his discharge, his supervisors were Durbin and Privett. (*Id.* at 59, Page ID # 4721.) At some point during his employment, he also worked under Busam. (Gillett Aff. ¶ 5, Page ID # 2227.)

Steelcraft's Blue Ash plant covers 580,000 square feet of manufacturing and warehousing space. (Parson Decl. re: Younger ¶ 5, Page ID # 419.) The plant manufactures steel doors and frames for residential and commercial structures. (*Id.* ¶ 3, Page ID # 418.) The hourly manufacturing employees who work at Steelcraft's Blue Ash plant are members of the United Steelworkers of America, AFL-CIO, Local 7697 (the "Union"). (*Id.* ¶ 4, Page ID # 418; Terry Mullins Dep. 8–9, Page ID # 5012–13.) The Union currently represents approximately 450 Steelcraft employees who work on three shifts and in many different departments. (Parson Decl. re: Younger ¶ 5, Page ID # 419.) Younger was at all relevant times and continues to be a member of the Union. (Younger Dep. 7–8, Page ID # 4546–47.) Gillette was a member of the Union during his employment. (Gillett Dep. 42, Page ID # 4704.)

The Union and Steelcraft have negotiated and agreed upon a collective bargaining

---

[3] Privett worked as a team leader in different departments at Steelcraft from 1999 to 2010, when he was let go during a reduction in force. (Privett Dep. 21–22, Page ID # 6477–78.) As a team leader, Privett supervised thirty-five to seventy-five people at any given time. (*Id.* at 23–24, Page ID # 6479–80.) Based on Privett's testimony, he appears to have supervised Younger and Gillett for approximately six months. (*Id.* at 26, 36, Page ID # 6482, 6492.)

agreement (the "CBA"), pursuant to which Steelcraft has enacted written policies or "Work Rules" governing Union employees. (*See* Parson Decl. re: Younger ¶ 4, Page ID # 418; Younger Dep. 40–41, Ex. 2, Page ID # 4579–80, 4651–53.) In addition, Steelcraft has enacted an Equal Employment Opportunity Policy prohibiting discrimination and a policy prohibiting harassment, both of which are posted throughout the Blue Ash plant on bulletin boards. (Parson Decl. re: Younger ¶ 6, Ex. B, Page ID # 419, 456–71; Mullins Dep. 11–12, Page ID # 5015–16; Gillett Dep. 43, Page ID # 4705.)

With regard to the enforcement of the CBA at the ground level, the Union leaders[4] work closely with Steelcraft's Human Resources ("HR") Department, specifically the Labor Relations Manager. During the majority of the time period at issue in this case, the office of Union President at the Blue Ash plant was held by employee Steven Carter (Carter Dep. 46–48, Page ID # 5293–95), and Steelcraft's Labor Relations Manager was Carl Parson (Parson Decl. re: Younger ¶ 1, Page ID # 418). Parson, an African-American male, has worked for Steelcraft since 1964 and has served as the Labor Relations Manager since approximately September or October of 1999. (*Id.* ¶¶ 1, 9, Page ID # 418–19; Parson Dep. 37–38, Page ID # 7855–56.) Parson's primary responsibility is the administration of the CBA, which includes the investigation of issues relating to and the discipline of Union employees such as Younger and Gillett. (Parson Decl. re: Younger ¶ 10, Page ID # 420.)

Employees wishing to report violations of the CBA or of Steelcraft's policies have at least

---

[4] Union leadership at the Blue Ash plant is comprised of a president, a vice president, a recording secretary, a treasurer, two guards, one guide, and eight committee-people. (Carter Dep. 169, Page ID # 5416.)

three options.  First, they can bring complaints directly to Steelcraft's HR Department.[5]  Second, they can file a grievance with the Union.   A grievance usually is preceded by an employee making either a written or verbal complaint to his or her supervisor.   (Carter Dep. 65–66, Page ID # 5313.) If they cannot work out a solution, the employee then can file a formal grievance using the Union's Grievance Form.[6]   (*Id*. at 67–69, Page ID # 5314–16.)   After the grievance is filed, a Steelcraft HR staff member, typically Parson, typically meets with the employee and two members of the Union Committee (the Grievance Committee-Person and the Grievance Chair).   (*Id*. at 74–75, Page ID # 5321–22.)   If the parties cannot resolve the matter at that stage and if the Union believes the grievance has merit, the full Union Committee meets with Steelcraft's HR staff and senior management to consider the complaint without the grievant present.   (*Id*. at 65, 78–81, Page ID # 5312, 5325–28.)   By that time, the Union should have completed a full investigation and be prepared to present any evidence that they have discovered.   (*Id*. at 80, Page ID # 5327.) If the parties still are unable to negotiate a resolution, a representative from the international division of the Union reviews the case to determine whether arbitration is warranted.   (*Id*. at 82, Page ID # 5329.)

Aside from filing a complaint directly with Steelcraft HR or filing a Union grievance, employees also may report problems via Steelcraft's anonymous help line, an option that has been available since 2003.   (Younger Dep. 41, Page ID # 4580; Parson Decl. re: Younger ¶ 6–7, Page

---

[5] There is little information in the record regarding the requirements for bringing such a complaint.

[6] The Grievance Form has three sections: the first section is filled out by the employee's team leader; the second section is filled out by the employee, sometimes with the assistance of a Union Committee-Person; and the third section provides a space for the company to respond. (Carter Dep. 71, Page ID # 5318.)   Parson usually is responsible for providing the company's response in the third section.   (*Id*. at 71, Page ID # 5318.)

ID # 419; Mullins Dep. 19, Page ID # 5023.)   A third party operates the anonymous hotline system for Steelcraft.   (Parson Decl. re: Younger ¶ 7, Page ID # 149.)   When an employee utilizes the anonymous hotline system, the employee is given a case number, which the employee can use to subsequently follow up on the status of the complaint.   (*Id.*)   The case number and follow-up process are explained to the employee during his or her initial call to the anonymous hotline.   (*Id.*)   Anonymous hotline complaints are not automatically directed to the Blue Ash plant.   (*Id*. ¶ 8, Page ID # 419.)   Rather, the complaints are initially directed to Steelcraft's Compliance Department, which reviews the complaints and determines who should be responsible for investigating the issue.   (*Id.*)   Team leaders are never advised of the presence of an anonymous complaint.   (Parson Decl. re: Younger ¶ 8, Page ID # 419.)

Regardless of the method used to report a violation, employee complaints typically are investigated by both Steelcraft and the Union.   (*See* Carter Decl. re: Younger ¶ 8, Page ID # 522.) Parson often conducts investigations on behalf of Steelcraft when employees file a Union grievance or complaint directly to the Steelcraft HR department, though other management or human resources employees may also be assigned to investigate certain cases depending on Parson's availability and the type of complaint lodged.   (*See* Parson Dep. 287, 343–45, Page ID # 8105, 8161–63.)

Both Younger and Gillett are aware of Steelcraft's policies prohibiting discrimination and harassment, and they understand the complaint procedures in place for employees who wish to report discrimination or harassment.   (Younger Dep. 40–41, Page ID # 4579–80; Gillett Dep. 42–43, 4704–05.)

As discussed in greater detail below, both Younger and Gillett were subjected to discipline for violations of Steelcraft policies.   Younger, though still employed by Steelcraft, has been

7

suspended three times since 2009 due to conflicts with other employees that occurred during work on Steelcraft property, one of which was in name only as it was a zero-day suspension. Gillett received numerous warnings regarding poor attendance and was eventually terminated in 2009 for violating Steelcraft's attendance policies. Both Plaintiffs claim the discipline they received is part of a larger pattern of discrimination and harassment, and Plaintiffs link the discipline to numerous other instances of alleged mistreatment.

Younger filed a charge of employment discrimination with the Ohio Civil Rights Commission on September 25, 2009. (*See* Younger Aff. Ex. 5, Page ID # 224.) On the charge form, he alleged discrimination in the form of harassment, unfair discipline, and retaliation in relation to his race. (*Id.*) Younger received a Notice of Right to Sue in connection with that charge on September 2, 2010.[7] (Doc. 2-1, Page ID # 26.) Shortly thereafter, Younger and Gillett filed the instant lawsuit.

Presently before the Court are the parties' cross motions for summary judgment and several related motions to strike, each of which the Court addresses separately below.

## II. MOTIONS TO STRIKE

### A. Defendant's Motion to Strike Plaintiffs' Harassment Claim (Doc. 61) and Plaintiffs' Motion to Strike Defendant's Motion to Strike Harassment Claims (Doc. 78)

On the same date that Defendant filed its response to Plaintiffs' summary judgment motion, Defendant also filed its Motion to Strike Plaintiffs' Harassment Claim, wherein Defendant moves the Court to strike from Plaintiffs' Motion for Summary Judgment: (a) all allegations of a

---

[7] Gillett did not file an administrative charge in connection with the allegations raised in this lawsuit. Presumably, that is the reason Gillett now asserts claims only under Ohio law and not also under Title VII.

hostile work environment on the ground that Plaintiffs' Complaint does not state such claims; and (b) affidavits of Plaintiffs' co-workers describing incidents or experiences of which Plaintiffs had no knowledge outside of the context of this lawsuit. In turn, Plaintiffs then filed a motion to strike certain portions of Defendant's motion to strike. For the reasons stated below, the Court **DENIES** Defendant's Motion to Strike Plaintiffs' Harassment Claim. As a result, the Court need not further address and **DENIES AS MOOT** Plaintiffs' Motion to Strike Defendant's Motion to Strike Harassment Claims (Doc. 78).

### 1. Hostile Work Environment Claims

As mentioned above, the dueling summary judgment motions filed by Plaintiffs and Defendant paint such different pictures of this case as to call to mind the classic novel, *A Tale of Two Cities*, by Charles Dickens. The difference in views stems from the somewhat ambiguous nature of Plaintiffs' Complaint, particularly with regard to Plaintiffs' discrimination claims. Plaintiffs' Complaint asserts employment discrimination claims under federal law (as to Younger) and Ohio law (as to both Younger and Gillett). Count I, titled, "Ohio Revised Code Section 4112.02 and 4112.99 — Race; National Origin; and Religion Discrimination," states in pertinent part the following:

> 5. Plaintiff Younger is an African American male.
> 6. Plaintiff Gillett is a Jewish American male.
> 7. IRC is an "employer" as defined in O.R.C. Section 4112.01(A)(2).
> 8. Plaintiffs are employees as defined in O.R.C. Section 4112.01(A)(3).
> 9. Based on informed and believe, Plaintiffs allege that IRC's Steelcraft Manufacturing Facility has a practice of employing and promoting to supervisory and management positions – individual's who have a long standing history of discriminating against African American and Jewish American IRC employees.
> 10. In their Supervisor and Management capacity, certain Caucasian IRC management and certain Caucasian IRC employees frequently engaged in a pattern and practice of subjecting African Americans and Jewish Steelcraft employees to discrimination practices involving adverse changes to the terms and conditions of their employment including, but not limited to: written warnings adverse schedule

9

changes, racial slurs, death threats, vandalism, loss of promotion opportunities, job suspensions and job loss.

11. Because Plaintiff Younger is an African American Male, certain IRC management and certain IRC employees frequently engaged in a pattern and practice of subjecting Plaintiff Younger to discrimination practices involving adverse changes to the terms and conditions of their employment including, but not limited to: written warnings, adverse schedule changes, racial slurs, death threats, vandalism, loss of promotion opportunities, job suspensions and job loss.

12. Because Plaintiff Gillett is a Jewish Male, certain IRC management and certain IRC employees frequently engaged in a pattern and practice of subjecting Plaintiff Younger to discrimination practices involving adverse changes to the terms and conditions of their employment including but not limited to: written warnings, adverse schedule changes, racial slurs, death threats, vandalism, loss of promotion opportunities, job suspensions and job loss. [Sic.]

(Complaint ¶¶ 5–12, Doc. 2, Page ID # 19–21.)

The federal discrimination claim is raised in Count IV, titled, "Violation of Title VII of the Civil Rights Act of 1964 − Race & National Origin[,] 42 U.S.C. § 2000." (*Id*. at 6, Doc. 2, Page ID # 23.) As the factual basis for that claim, paragraph 22 realleges and incorporates all allegations previously raised in the Complaint, including those raised in the paragraphs excerpted above.

In moving for summary judgment on the discrimination claims, Defendant characterizes them as disparate treatment in nature. Specifically, Defendant characterizes Younger's discrimination claims as asserting that he has been unlawfully suspended as a result of discrimination based on his race and Gillett's discrimination claim as asserting that he was unlawfully terminated as a result of discrimination based on his religion. In their cross-motion for summary judgment, Plaintiffs paint a very different picture of their discrimination claims. They characterize those claims as asserting discrimination in the form of harassment resulting in a hostile work environment. They focus less on Younger's suspensions and Gillett's termination, and more on the overarching pattern of discriminatory behavior and harassment they claim to have

10

suffered over the course of several years at Steelcraft, and they argue that Steelcraft knowingly employed management and hourly employees who espoused racist and anti-Semitic beliefs and who engaged in a pattern of discriminatory treatment of African-American and Jewish employees.

In its response to Plaintiffs' Motion for Summary Judgment, Defendant clings to its own interpretation of Plaintiffs' Complaint and declines to respond directly to Plaintiffs' allegations regarding hostile work environment.   In lieu of a direct response, Defendant merely states that Plaintiffs' Complaint does not state hostile work environment claims.   (*See* Doc. 60 at 39, Page ID # 1173).

Defendant expands on the basis for that argument in its Motion to Strike Plaintiffs' Harassment Claim, wherein Defendant requests under Federal Rule of Civil Procedure 12(f) that the Court strike from Plaintiffs' Motion for Summary Judgment all allegations of a hostile work environment.   Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter . . . on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."   Fed. R. Civ. P. 12(f)(2).

Because Defendant reads Plaintiffs' Complaint as stating disparate treatment rather than harassment claims, Defendant views any allegations pointing to a discrimination claim based on Plaintiffs' exposure to a hostile work environment to be immaterial to the question of whether Plaintiffs are entitled to summary judgment as to the claims asserted in their Complaint.   The ultimate question, therefore, is whether Plaintiffs' discrimination claims may fairly be read to assert claims based on hostile work environment.

Though Defendant discusses "harassment" claims as though they are separate and distinct from "discrimination" claims, the federal and state statutory schemes upon which Plaintiffs base

their claims treat harassment as a form of discrimination.   Title VII deems unlawful an employer's decision "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"   42 U.S.C. § 2000e-2(a)(1).   The Supreme Court has long recognized that workplace harassment which occurs on the basis of any of the protected traits delineated in Title VII is a form of discrimination under section 2000e-2(a)(1).   *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." (Internal citations and quotation marks omitted)); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986) (holding "that a claim of 'hostile environment' sex discrimination is actionable under Title VII").

The statutory scheme governing unlawful employment discrimination in Ohio, Ohio Revised Code Chapter 4112, is similar in its treatment of workplace harassment.   Section 4112.02(A) provides that it is unlawful:

> [f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A).   Discrimination, as conceived of in that statute, has been held to include subjecting the employee to a hostile work environment.   *See Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 176, 729 N.E.2d 726, 732 (2000); *Vitatoe v. Lawrence Industries, Inc.*, 153 Ohio App. 3d 609, 615–16, 795 N.E.2d 125, 130 (8th Dist. 2003), *appeal not allowed*, 102 Ohio St. 3d 1410, 806 N.E.2d 562 (2004).

12

Defendant cites a number of cases, some from the Sixth Circuit and some from other circuits, to support its assertion that "Discrimination Claims Do Not Include Harassment Or Hostile Work Environment Claims."  (*See, e.g.,* Doc. 84 at 2, Page ID # 4315 (citing *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009)) and Doc. 61 at 3–4, Page ID # 1921–22 (citing *Malhotra v. KCI Tech., Inc.*, 240 F. App'x 588 (4th Cir. July 11, 2007); *Artis v. U.S. Foodservice, Inc.*, No. ELH-11-3406, 2012 WL 2126532 (D. Md. June 12, 2012); and *Cleveland v. La-Z-Boy Inc.*, No. 4:08cv132-DPJ-LRA, 2009 WL 3531688 (S.D. Miss. Oct. 27, 2009))). Contrary to Defendant's reading of those cases, the opinions relied upon merely demonstrate that there are several forms of discrimination claims, including hostile work environment claims.  For example, in *Hunter*,[8] the Sixth Circuit states that "[u]nder Title VII, two types of actions may be brought: (1) discrete discriminatory acts, and (2) claims alleging a hostile work environment." *Hunter*, 565 F.3d at 993 (internal quotation marks omitted).  However, the court did not hold that a plaintiff must plead each type of action under separate counts in order to state a claim.[9]  In fact,

_____

[8] *Hunter* involved a 62-year-old white male who brought an employment discrimination action against the United States Army, alleging, among other claims, discrimination on the basis of his race and sex in violation of Title VII.  *Hunter*, 565 F.3d at 989.

[9] *Malhotra* similarly deals with different forms of discrimination claims in the context of exhaustion of administrative remedies rather than in regard to the manner in which such claims should be plead.  240 F. App'x at 589–90.  Specifically, in that case, the court found that a plaintiff could not assert sex discrimination, retaliation, or harassment, because when filing his charge with the EEOC, he had only alleged age and national origin discrimination based on the fact that an African-American woman had been promoted when he was fired.  *Id*. at 590.  *Artis* also deals with exhaustion of administrative remedies, and is not directly applicable to the instant case. *Artis*, 2012 WL 2126532, at *8–9.  In *Cleveland*, like in *Hunter*, the district court found that the plaintiff's complaint did not state a claim for sexual harassment where the discrimination claim asserted in her complaint referred only to discrete discriminatory acts — specifically, that the defendant had discriminated against her based on her sex by failing to promote her at various times during her employment, and by eliminating her position and offering to demote her to a different position at the same pay level — and where the plaintiff had failed to exhaust her administrative remedies with regard to such a claim.  *Cleveland*, 2009 WL 3531688, at *5–7.  Defendant makes

the court implicitly endorsed the opposite view, recognizing that the plaintiff's complaint asserted both types of action under the same three counts: "The complaint contained four counts. . . . Counts I, II, and III alleged reverse-race, reverse-gender, and age discrimination.  These counts also asserted that Hunter was subjected to a hostile work environment when he was harassed by Pitts from 2002 to 2004."  *Id.* at 991–92. The district court had dismissed the race, sex, and age discrimination portion of those claims because it determined that: (1) they were properly considered as discrete acts of discrimination separate and apart from the harassment that the plaintiff alleged amounted to a hostile work environment, and that (2) unlike the hostile work environment claim, the claims of discrimination based on discrete acts were time-barred.  *Id.* at 992–93.  The Sixth Circuit affirmed that holding, finding that the district court did not err in considering allegations of denial of training and promotion opportunities as discrete acts of discrimination rather than as a form of hostile work environment, noting that such acts, without more, cannot amount to a hostile work environment:

> [H]ostile-work-environment claims involve[ ] repeated conduct and require the plaintiff to demonstrate that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment. The failure to promote an employee or select him for a training program is a discrete act that *cannot alone* amount to a hostile work environment.

*Id.* at 994 (internal citations and quotation marks omitted) (emphasis added).[10]

---

no argument as to exhaustion of administrative remedies in this case.   However, the Court notes that Younger did check "Harassment" as the "[t]ype of discrimination" he alleged to have suffered on his 2009 Ohio Civil Rights Commission Charge form.   (Younger Aff. Ex. 5, Page ID # 2224.)

[10] In addition to *Hunter*, Defendant relies on three additional Sixth Circuit cases.   While those cases reiterate the general proposition stated in *Hunter* that there are at least two different causes of action that may be brought under Title VII, none of the cases address the level of factual detail that must be asserted in a complaint to state a claim for hostile work environment harassment.   *See Steward v. New Chrysler*, 415 F. App'x. 632, 639 (6th Cir. 2011) (merely noting,

The instant case differs from *Hunter* because Younger and Gillett do not merely list a number of discrete discriminatory acts in their discrimination claims. Rather, they allege a pattern and practice of conduct involving harassing behavior. The Court notes in particular Plaintiffs' assertion that certain Steelcraft management and hourly-wage employees engaged in a pattern and practice of subjecting Younger and Gillett to discriminatory practices involving "racial slurs, death threats, vandalism," and other discriminatory practices resulting in adverse changes to the terms and conditions of their employment because of Younger's race and Gillett's religion. The federal pleading standards require that a complaint contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint "does not need detailed factual allegations," but it must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Applying that standard to Plaintiffs' Complaint, the Court does not find, as Defendant suggests, that the omission of the specific terms "harassment" or "hostile work environment" from the description of Plaintiffs' discrimination claim is fatal to Plaintiffs' case. Though Plaintiffs' Complaint was not artfully drafted, the facts asserted in support of their discrimination claims, as described above, are sufficient to allege both disparate treatment based

---

without further elaboration, that the plaintiff had not invoked a hostile work environment theory of discrimination in support of her race discrimination claim); *Love v. Electric Power Board of Chattanooga*, 392 F. App'x. 405, 409 (6th Cir. 2010) (affirming order granting summary judgment to the defendant where the plaintiff failed to present sufficient evidence to create a triable issue of fact as to whether his workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe and pervasive to alter the conditions of his employment); *Schramm v. Slater*, 105 F. App'x 34, 40 (6th Cir. 2004) (affirming a magistrate judge's ruling, as to the defendant's motion for summary judgment on the plaintiff's harassment claim, that the plaintiff failed to submit sufficient evidence that the alleged harassment he suffered was based on sex or that such harassment was sufficiently severe as to amount to a hostile work environment).

on discrete discriminatory acts and harassment in the form of a hostile work environment,[11] regardless of the labels Plaintiffs used in describing their claims.[12]

As a final comment on this matter, given the nature of the discovery that Plaintiffs pursued in this case, the Court questions the credibility of any suggestion on the part of Defendant that it did not expect Plaintiffs to assert a hostile work environment theory of discrimination.   Had there been any true doubt as to Plaintiffs' intent at the outset of this case, there were several options at Defendant's disposal, including a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a motion for judgment on the pleadings under Rule 12(c), or a motion for a more definite statement under Rule 12(e), all of which could have been filed at an earlier stage of this lawsuit. Plaintiffs' Complaint could have been more concise, but the ambiguities should have been apparent from the outset and such imprecision is best dealt with prior to engaging in months of discovery and to the filing of dispositive motions.   To challenge such ambiguities this late in a lawsuit only creates further confusion, delay, and an unnecessary proliferation of motions, as is evidenced by the docket in this case.

The Court will not strike the allegations of hostile work environment from Plaintiffs' Motion for Summary Judgment.   Furthermore, the Court construes Plaintiffs' discrimination claims as asserting two different forms of discrimination: (1) disparate treatment discrimination

---

[11] The elements that a plaintiff must demonstrate to establish discrimination claims based on disparate treatment and harassment are discussed in detail below, and to avoid unnecessary repetition in an already lengthy opinion, the Court declines to address each element in depth in this Section.

[12] Defendants cite a number of cases in which courts in other circuits have dismissed claims for harassment due to the complaint's failure to state sufficient facts to give rise to such claims.   (*See* Doc. 84 at 5–6, Page ID # 4318–19.)   The Court has reviewed those cases, none of which are binding precedent, and finds them to be either distinguishable or unpersuasive.

related to specific adverse employment actions and (2) hostile work environment claims related to an alleged ongoing pattern of discrimination and harassment on the part of Plaintiffs' co-workers and supervisors.

### 2. Co-Worker Affidavits

The Court also declines to strike any of the affidavits of Plaintiffs' co-workers. To the extent that such affidavits contain irrelevant and/or inadmissible evidence, as discussed in greater detail below, the Court simply does not consider that evidence in connection with Plaintiffs' claims.

### B. Defendant's Motion to Strike Portion of Younger Affidavit (Doc. 69) and Plaintiffs' related Motion to Strike (Doc. 82)

Defendant's second motion to strike raises objections to portions of Younger's affidavit. Specifically, Defendant moves to strike allegations of retaliation connected with Younger's 2011 attendance record and allegations involving a 2010 problem with Younger's medical insurance. Defendant argues that such allegations are not relevant to the complaints alleged in Plaintiffs' 2010 Complaint as they relate to incidents alleged to have occurred after the filing of that Complaint. Defendant points out that Younger had the opportunity to seek leave to amend his Complaint in this case to include new retaliation claims related to those allegations, but chose not to do so. In August 2012, Plaintiffs sought guidance from this Court regarding the potential for at least two amendments to the Complaint. The Court advised Plaintiffs at that time that they could move to amend their complaint to add new retaliations claims, but that they would need to file a proposed amended complaint before any such amendments could be considered. For reasons unknown to this Court, Plaintiff Younger opted to file a new lawsuit (*see Younger v. Ingersoll-Rand*, 1:12-cv-933) rather than amend the Complaint in the instant lawsuit. Defendant

has moved for summary judgment in Case No. 1:12-cv-933, and the Court will address that motion and the related evidence in a separate order.

In sum, the Court agrees that allegations of interference with medical insurance and retaliation related to absences accrued in 2011 are not properly before the Court in this matter. However, as none of the objected-to portions of Younger's affidavit factored into the Court's rulings on the parties' cross-motions for summary judgment, the Court **DENIES AS MOOT** Defendant's motion to strike those allegations and related arguments.   The Court also **DENIES AS MOOT** Plaintiffs' related Motion to Strike Pages 9, 10, 11, and 12 of Defendant's Motion to Strike Anthony Younger's Sworn Affidavit.

### C.      Defendant's Motion to Strike Portions of Gillett Affidavit (Doc. 70)

The Court similarly **DENIES AS MOOT** Defendant's Motion to Strike Portions of Gillett Affidavit, in which Defendant moves to strike certain allegations falling outside the scope of Plaintiffs' Complaint, as such allegations did not factor into the Court's decision on the cross-motions for summary judgment.

## III.    MOTIONS FOR SUMMARY JUDGMENT

As discussed above, the parties dispute the nature of the claims alleged by Plaintiffs in their Complaint.   Plaintiffs move for summary judgment on the hostile work environment portion of their discrimination claims and on their retaliation claims.   Defendant moves for summary judgment as to the disparate treatment portion of Plaintiffs' discrimination claims as well as Plaintiffs' retaliation and intentional infliction of emotional distress claims.   As noted above, Defendant refused to directly address Plaintiffs' hostile work environment claims in either its own Motions for Summary Judgment or in its Response to Plaintiffs' Motion for Summary Judgment. Instead, Defendant refers the Court to its Motion to Strike Plaintiffs' Harassment Claim, wherein

Defendant argues that if the Court construes the Complaint as stating hostile work environment claims and denies Defendant's motion to strike, Defendant nonetheless would be entitled to summary judgment on such claims.   The Court addresses each claim separately below, beginning with the disparate treatment discrimination claims.

As an initial matter, however, the Court can easily dispose of certain claims.   First, to the extent Plaintiffs intended to raise discrimination claims based on national origin status, they conceded abandonment of those claims at oral argument.   Accordingly, the Court grants summary judgment to Defendant as to those claims.   The Court also grants summary judgment to Defendant as to Plaintiffs' intentional infliction of emotional distress claims as Plaintiffs failed to make more than a passing reference to those claims either in their own Motion for Summary Judgment or in their Response to Defendant's Motions for Summary Judgment.

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment.   Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986).   The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).   In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present

affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52 (1986). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

The Court carefully reviews "those portions of the submitted evidence designated by" both parties. *Guarino v. Brookfield Twp. Tr's.*, 980 F.2d 399, 410 (6th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . .."). Although the Court "may consider other materials in the record," Fed. R. Civ. P. 56(c)(3), the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." *Guarino*, 980 F.2d at 410.

### B.    Disparate Treatment Discrimination

In moving for summary judgment on Plaintiffs' disparate treatment claims, Defendant focuses on concrete disciplinary actions Steelcraft took against the Plaintiffs. Defendant characterizes Younger's disparate treatment claim as asserting that he was unfairly suspended on

20

three occasions because of his race, and Gillett's claim as asserting that he was unfairly terminated because of his religion. Plaintiffs have never clarified the precise nature of their disparate treatment claims, leaving the Defendant and the Court in a somewhat precarious position as far as determining whether there are any material questions of fact precluding summary judgment of those claims. Without further guidance from Plaintiffs, the Court finds that those claims cannot survive summary judgment for the reasons explained below.

### 1.    Legal Standard

Like hostile work environment claims, disparate treatment discrimination claims brought under Ohio law are governed by the same standards as Title VII claims. *See Greene v. St. Elizabeth Hosp. Med. Ctr.*, 134 F.3d 371 (6th Cir. 1998) ("Ohio courts have described it as 'well settled' that Title VII and Ohio discrimination claims are subject to the same standards."); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (Ohio 1981).

As there is no direct evidence that Younger's suspensions and Gillett's termination were due to their race and religion respectively, Plaintiffs would need to rely on circumstantial evidence to prove their disparate treatment claims. In such cases, courts employ a burden-shifting framework to analyze a plaintiff's claim. Under that framework, the plaintiff first "has the burden of proving by a preponderance of the evidence a prima facie case." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). To state a prima facie case of discrimination, the plaintiff must show that: (1) he is a member of the protected class; (2) he suffered from an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently from similarly situated members of the unprotected class. *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 402–05 (6th Cir. 1999); *Chattman v. Toho Tenax America, Inc.*, 686 F.3d

21

339, 346 (6th Cir. 2012). If the plaintiff succeeds, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). If defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. *Id*.

### 2. Younger

#### a. Factual Background

Though Younger remains employed by Steelcraft, he has been suspended at least three times in recent years — twice in 2009 and once in 2011 — for conduct found to violate Steelcraft's policies. Parson was responsible for investigating and issuing discipline on all three of those suspensions. (Parson Decl. re: Younger ¶ 13, Page ID # 420.) During the course of his employment with Steelcraft, Parson has attended several off-site training seminars dealing with investigating employee disputes, and Steelcraft has given him a process manual that includes guidelines for conducting an investigation. (Parson Dep. 55–57, Page ID # 7873–75.) He also has received one-on-one training from Steelcraft's legal counsel. (*Id*. at 55, Page ID # 7873.) When investigating disputes between two or more employees, Parson has occasionally used a method referred to as the "reasonable man standard" to judge the credibility of individuals involved and of the allegations they raise. (Mullins Dep. 61–62, Page ID # 5065–66; Parson Dep. 71, 74–75, Page ID # 7889, 7892–93.) When asked to describe that standard, Parson gave the following example:

> Two employees got into an altercation. One employee alleges that this guy walked up and punched me for no reason whatsoever. When this employee, say, reported it to the police department, the police department said that is totally irrational for you to make that statement, that it's not reasonable that a man would walk up and punch you for nothing.

(Parson Dep. 72, Page ID # 7890.)

Parson maintains that it was his training and experience, rather than any improper race-related considerations, that guided his investigations into complaints lodged against Younger. According to Parson, all three suspensions he gave Younger were based on "Work Rule Number Six" of the "Serious [C]onduct" category (hereinafter "SC Rule 6").  (Parson Decl. re: Younger ¶ 14, Ex. B, Page ID # 420, 462.)   That rule prohibits an employee from "[e]ngaging in harassment (Sexual, Racial or any other reason) of other employees or the general public while on Company premises or Company business."  (*Id*. ¶ 14, Ex. B, Page ID # 420, 462.)   Violation of SC Rule 6 "ordinarily justifies discharge for the first offense . . .."  (*Id*. ¶ 14, Ex. B, Page ID # 420, 462.)

Of those three suspensions, two occurred in 2009.   Both were related to incidents involving Todd Parker, another Union employee with whom Younger had ongoing problems and who allegedly harassed both Younger and Gillett due to their race and religion, as described below. (*See* Parson Dep. 163–64, Page ID # 7981–82.)   The first suspension was imposed after a team leader and a manager reported that Younger had been harassing Parker in July 2009.   (*Id*. at 157, Page ID # 7975; Parson Decl. re: Younger ¶ 17, Ex. C, Page ID # 421, 473–74.)   During his investigation of that incident, Parson interviewed Younger, Parker, and other witnesses to the event.   (Parson Decl. re: Younger ¶ 17, Ex. C, Page ID # 421, 473–74.)   He ultimately found that Younger's behavior — specifically, yelling at Parker from across the work area and telling Parker that he would "take him across the street and 'beat his ass'" — amounted to a violation of SC Rule 6.  (*Id*. ¶ 17, Ex. C, D, Page ID # 421, 473–77.)   Younger was suspended for four days as a result of that incident.   (*Id*. Ex. D, Page ID # 421, 476–77.)

Younger's second suspension, issued on September 24, 2009, resulted from Team Leader Scott Durbin overhearing Younger call Parker a "punk-ass bitch."   (*Id*. ¶ 18, Ex. E, Page ID # 421–22, 479–80.)   After Durbin reported the incident, Parson met with Younger and his Union

23

representative in Parson's office. (*Id.* ¶ 18, Page ID # 421–22.) Parson claims that during that meeting, Younger was belligerent and threatening, and he raised his voice inappropriately. (*Id.*) Younger denies such conduct. (Younger Dep. 58–59, Page ID # 4597–98.) Following that incident, Steelcraft again suspended Younger and required him to attend anger management counseling through the Employee Assistance Program ("EAP") before returning to work.[13] (Parson Decl. re: Younger ¶ 18, Ex. E, Page ID # 422, 479–80; Carter Dep. 22, Page ID # 5270.)

During Younger's September 2009 suspension, Steelcraft attempted to contact Younger several times to discuss his returning to work or to schedule a meeting with him, but he did not respond. (Carter Dep. 20–21, Page ID # 5268–69.) Eventually, Union President Carter and another Union representative, Don Bramer, met with Younger at the Union Hall. (*Id.* at 20–21, Page ID # 5268–69.) At that meeting, Younger indicated that he believed Durbin picked on him because of his race. (*Id.* at 25, 27–28, Page ID # 5273, 5275–76.)

Shortly thereafter, Younger and Carter met with Parson to discuss Younger's anger management counseling. (*Id.* at 21–22, Page ID # 5269–70.) According to Carter, Younger had chosen to obtain counseling from an outside provider rather than from an EAP-approved counselor. (*Id.* at 22–23, Page ID # 5270–71.) Carter testified that during that meeting, Younger was aggressive, refused to sit down, and refused to remove his sunglasses. (*Id.* at 21, Page ID # 5269.) Ultimately, Steelcraft approved the counseling and permitted Younger to return to work.

---

[13] On September 25, 2009, one day after the effective date of his second suspension, Younger filed his Ohio Civil Rights Commission complaint. (Parson Dep. Ex. 20, Page ID # 8264.) Among the other allegations made in that complaint, Younger claimed that Parson had unjustly suspended him while failing to take action to discipline Parker for similar behavior. (*Id.*) Younger further claimed that after he reported an incident wherein Parker allegedly viewed a KKK website while at work, which incident is discussed in greater detail below, Steelcraft management began to more closely monitor his work, and Parker continued to harass him without reproach. (*Id.*) It is unclear when Parson learned of the Ohio Civil Rights Commission complaint.

(*Id*. at 23, Page ID # 5271.)   In total, the second suspension lasted approximately twenty days. (*See* Parson Decl. re: Younger Ex. E, Page ID # 479–80.)

Younger's third and most recent suspension, which occurred in 2011, resulted from a complaint by an African-American Union employee, Dante Ware.   (*Id*. ¶ 15, Page ID # 421.) Ware alleged that on August 16, 2011, he and Younger got into an argument after Younger asked him to sign an affidavit related to the instant case, during which argument Younger called Ware a "ho-ass ni****."   (*Id*. ¶ 15, Page ID # 421; Parson Dep. 144, Page ID # 7962; Ware Dep. 87–88, Page ID # 6421–22.)   Younger denies making that statement.   (Younger Dep. 61–62, Page ID # 4600–01.)   Because the incident occurred near the end of his shift, Ware waited until the following day to report the incident to his Union representative, Jerry Fannon.   (Ware Dep. 88, Page ID # 6422.)   Fannon in turn reported the incident to Steelcraft's HR Department, and at some point shortly thereafter, Parson met with Ware and informed him that he would have to submit a written complaint.   (*Id*. at 99–100, Page ID # 6433–34.)   It took Ware a few weeks to complete the statement because he was working two jobs at the time.   (*Id*.)   Ware ultimately submitted his written statement during a September 6, 2011 meeting with Fannon and Parson. (*Id*. at 91–92, Page ID # 6425–26.)   During that meeting, Parson produced a typed version of Ware's statement based on Ware's handwritten version, and Ware affirmed with his signature the truth of the typed statement.   (*Id*.)

Parson investigated Ware's complaint, but he could not locate any witnesses to support Ware's version of events.   (Parson Decl. re: Younger ¶ 16, Page ID # 421.)   When Parson spoke with Younger, Younger identified at least one individual who Younger claims witnessed his dispute with Ware.   (Parson Dep. 136, Page ID # 7954.)   Parson did not interview that individual because he did not believe the individual was credible.   (*Id*. at 140, Page ID # 7958.)   Parson then

25

asked Tyrone Williams, a management employee, to investigate the matter. (*Id*. at 136–37, Page ID # 7954–55.) Though Parson could not identify any witnesses to corroborate Ware's allegations, he determined based in part on the reasonable person standard that Ware's complaint was credible, and he disciplined Younger by imposing a zero-day suspension. (*Id*. at 139, Page ID # 7957, Parson Decl. re: Younger ¶ 16, Page ID # 421.) Parson claims that had there been a corroborating witness, the incident may have resulted in Younger's discharge. (Parson Decl. re: Younger ¶ 16, Page ID # 421.)

Younger did not grieve the 2009 suspensions, but he sought arbitration regarding the 2011 suspension. (*See* Younger Dep. 14–16, Page ID # 4553–55.) Younger takes issue with Parson's account of his suspensions, alleging that Parson did not believe a word he said, attempted to prolong his second 2009 suspension, and intimidated him by requiring him to complete counseling prior to returning to work. (*Id*. at 34–36, Page ID # 4573–75.) Younger maintains that he was falsely accused of threatening Ware and Parker, and he alleges that as a result, he "was labeled an angry black-man," though he does not indicate who labeled him as such or when if ever he actually heard that label used. (Younger Aff. ¶¶ 13–14, Page ID # 2216.)

### b. Analysis

Younger provides no explanation of how the evidence he relies upon demonstrates a prima facie case of disparate treatment discrimination. He does not specifically address the prima facie factors either in his response to Defendant's motion for summary judgment or in his own motion for summary judgment. Instead, he focuses on his hostile work environment claim. Accordingly, the Court is left to surmise what his argument might be based on the evidence he sets forth.

Defendant does not explicitly dispute the first, second, or third factors of the prima facie

test.   As to the first and third factors, there is little if any question that Younger is a member of a protected class based on his race or that he is qualified for his position at Steelcraft.   As to the second factor, the Sixth Circuit has explained that "[a] materially adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities, and a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Arnold v. City of Columbus*, 11-3459, 2013 WL 628447 (6th Cir. Feb. 20, 2013) (internal quotations omitted) (citing *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 594 (6th Cir. 2007) and *Ford v. Gen. Motors Corp.,* 305 F.3d 545, 553 (6th Cir. 2002)).   For the purpose of its motion for summary judgment, Defendant does not dispute that the above-described suspensions could qualify as adverse employment actions.   Plaintiff has not clearly identified any other material change in his employment that potentially could be characterized as an adverse employment action.

       In contrast to the first three factors, Defendant does dispute Younger's ability to prove the fourth factor, pointing to a lack of evidence that similarly situated white employees who violated SC Rule 6 were treated differently than Younger.   Plaintiff does not respond to this argument directly.   However, in connection with his hostile work environment claim, he alleges instances of white employees engaging in harassing behavior, and there is at least some, albeit minimal evidence that Steelcraft management employees were made aware of that behavior in certain instances.   For example, he testified that in 2007, one of his co-workers, Laura Gast, called him a "ni****."   (Younger Dep. 52–53, Page ID # 4591–92.)   He further claimed that he complained of the incident to Privett, and that he does not believe Steelcraft ever investigated the complaint.

(Younger Dep. 52–54, Page ID # 4591–93.)

Assuming for the purpose of this order only, that the evidence identified by Younger is sufficient to establish a prima facie case of race discrimination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for suspending Younger on the three occasions identified.   Defendant easily meets this burden.   Specifically, Defendant maintains that Parson, Steelcraft's African-American Labor Relations Manager, investigated all three of the incidents in question and determined Younger had violated Steelcraft policy, specifically SC Rule 6.   *See, e.g., Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009) (holding that purportedly violating company's code of conduct is a facially legitimate, nondiscriminatory reason for termination).   Steelcraft also points out that since 2005, the following white Union employees were disciplined for violating that same policy:   Jerimah Saal (discharged), Pete Glaser (suspended), Glenn Watson (suspended), Sharon Lewis (written warning), Paul Burgess (suspended), Robert Hitt (written warning), and Scott Bridges (suspended).   (*See* Parson Decl. re: Younger ¶ 14, Page ID # 420–21.)

The burden therefore shifts back to Younger to demonstrate pretext, which he can do by proving one of the following: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the discipline; or (3) that the proffered reasons were insufficient to motivate the discharge.   *Chattman*, 686 F.3d at 349.   "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2000); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the

28

employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

In this case, Younger attempts to show pretext by challenging the manner and sufficiency of Parson's investigations and by arguing that he did not in fact commit the actions for which he was suspended.   As to all three suspensions, Younger takes issue with the standard employed by Parson in his investigations, arguing that it is too subjective.   Additionally, Younger denies engaging in the conduct that led to his suspensions, arguing that he was falsely accused of that behavior by others.   The Sixth Circuit recently rejected similar arguments in a Title VII retaliation case, *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012), wherein the Sixth Circuit found that the plaintiff could not demonstrate pretext at the summary judgment stage merely by arguing that she was not guilty of the conduct that ultimately led to her termination.   There, the Sixth Circuit explained:

> [A] case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination.   Instead, the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (stating that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason").   Therefore, the plaintiff was required to offer evidence from which a jury could reasonably reject the defendants' stated reason for disciplining — and ultimately firing — her, and that it used those reasons to mask its retaliation against her. . . .

*Id*. at 530.   By analogy, that logic is equally applicable to Title VII disparate treatment discrimination claims.   In other words, Younger must do more than simply argue that he did not engage in the conduct for which he was disciplined or that the conduct was insufficient to justify his suspensions.   He must present at least some evidence from which a jury could infer that discrimination on the basis of his race was the real reason for his suspensions.

Also relevant to the instant case is the *Tingle* Court's reaffirmation of the appropriateness of the "honest belief" rule in this context, as explained in the following passage:

> If an employer has an "honest belief" in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext.  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (stating that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect").  As we have stated, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713–15 (6th Cir. 2007)).
>
> The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process.  We have noted that the "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action."  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  The employer certainly must point to particularized facts upon which it reasonably relied.  But "we do not require that the decisional process used by the employer be optimal or that it left no stone unturned."  *Smith*, 155 F.3d at 807; *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).
>
> To defeat a summary judgment motion in such circumstances, the "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (internal citations, quotation marks, and brackets omitted) (alteration in original).  For example, the plaintiff may produce evidence that an error by the employer was "too obvious to be unintentional."  *Smith*, 155 F.3d at 807 (citation omitted).  However, "[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact."  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x. 783, 791 (6th Cir. 2006)).

*Tingle*, 692 F.3d at 530-31.

Applying those principles to the instant case, the Court finds that Younger fails to

demonstrate pretext as to any of his three suspensions.   With regard to both of the 2009 incidents, Younger argues a jury could find, based on evidence that Parker held racist beliefs, that Parker made up the allegations leading to Younger's suspensions.   That argument is unpersuasive for at least two reasons.   First, the fact that Parker potentially held racist beliefs and that those beliefs may have had something to do with the repeated disputes between him and Younger does not demonstrate that Younger did not act in the manner alleged.   Second, neither of those incidents was reported by Parker.   Rather, they were reported by team leaders who allegedly witnessed Younger's behavior.   The Court acknowledges that when viewed in light of the broader allegations of harassment described below there is some question, however slight, as to whether the team leaders' decision to report Younger's conduct may have been motivated by Younger's race or that their interpretations of what they observed may have been tainted by racial animus. But whatever their motivations may have been, the undisputed evidence shows that Parson, the ultimate decision-maker, engaged in a full investigation of the incidents guided by the same principles and standards that he applies to all of his investigations.

Younger points to minimal evidence calling into question the reasonableness of Parson's investigations.   Specifically, there is evidence that Parson did not interview witnesses identified by Younger in relation to the incidents leading to Younger's first and third suspensions.   As to the July 2009 dispute, Parson indicated in fact he had not interviewed the witnesses identified by either Younger or Parker, but instead chose to interview three other individuals.   (Parson Dep. 159–62, Page ID # 7977–80.)   The notes that Parson made at the time of the investigation indicate that he chose which people to interview based on their proximity to the location of the verbal exchange between Younger and Parker.   (*See id*. at Ex. 15, Page ID # 8258.)   As to the 2011 incident, Parson explained that he did not interview the witness Younger identified because he did

31

not believe the individual to be credible.   Without more, such as evidence that Parson typically interviews all witnesses identified by employees accused of wrongdoing but did not do so in Younger's case, Parson's failure to interview the witnesses identified by Younger is not sufficient to demonstrate pretext.   If anything, that evidence might show that Parson's investigational methods are less than perfect.   However, as noted above, the applicable law does not require that an employer's "decisional process . . . be optimal" or that the decision-maker leave "no stone unturned."   *Smith*, 155 F.3d at 807.

Younger also attempts to challenge the reasonableness of the 2011 investigation by comparing it to another investigation in which, Younger alleges, Parson applied different standards.   Specifically, Younger points to an incident in 1997 in which an African-American employee, Mark Gibson, left a voice message for Parson alleging that during the previous day, an employee had called him "ni****." (*See* Parson Dep. 90–101, Page ID # 7908–19.)   Parson investigated the incident, but ultimately concluded the complaint was not credible because Gibson waited too long to report the incident and because there were no witnesses present to substantiate Gibson's allegation.   (*Id.*)   In comparison, Younger argues, Parson suspended Younger for similar behavior although it took Ware several weeks to submit his complaint and there similarly were no witnesses to substantiate his allegations.   However, the Gibson investigation is not a proper comparator for several reasons.   That incident occurred in 1997, roughly fourteen years prior to the Ware incident, and Parson explained that he was not even working in the human resources department at that time.   (*Id.* at 135–36, Page ID # 7953–54.)   According to Parson, he has changed the manner in which he conducts investigations since transferring to that department. (*Id.*)   Furthermore, with regard to the timeliness of the complaint, Ware may have taken several weeks to submit a formal *written* complaint, but he had notified his Union representative of the

32

incident on the day after it occurred, explaining that he waited until the following day because the altercation took place at the end of his shift.   Additionally, Parson pointed out during his deposition that in contrast to the Ware incident, in which Ware did not claim there to be any witnesses, Gibson actually had identified witnesses who subsequently were interviewed and did not corroborate Gibson's allegation, thus detracting from the credibility of Gibson's own account. (*Id*. at 137–39, Page ID # 7955–57.)

In sum, based on the evidence before this Court, Younger's denial that he committed the conduct complained of and his objection to the manner in which Parson conducted the investigation is not sufficient to establish pretext.   Younger may disagree with the manner in which Parson conducted his investigations and with the discipline imposed, but there is absolutely no evidence that Parson treated Younger differently on the basis of his race.   This is particularly true as to the Ware incident, a dispute that involved two African-American males (Younger and Ware) and that was investigated by an African-American male (Parson).   Accordingly, Defendant is entitled to summary judgment on Younger's disparate treatment discrimination claim.

### 3.     Gillett

Like Younger, Gillett focuses on his hostile work environment claim and does not clearly identify the nature of his disparate treatment claim or address the prima facie factors he would have to prove with regard to that claim.   The Court therefore assumes, as did Defendant, that Gillett's disparate treatment claim pertains to his termination.[14]

#### a.     Factual Background

Gillett was terminated by Steelcraft in 2009.   The reason given by Steelcraft for his

---

[14] Gillett has not identified any other discrete employment actions that might form the basis for such a claim.

termination was that Gillett violated Steelcraft's Attendance Policy.   (Gillett Dep. 41, Page ID #
4703; Parson Decl. ¶ 13, Page ID # 634.)   Union employees' attendance is monitored using a time
clock.   (Privett Dep. 33–34, Page ID # 6489–90.)   Every employee is assigned an individual
"clock number" for tracking purposes. (*See* Parson Decl. re: Gillett Ex. C ¶ 2, Page ID # 686.)   At
some point, Steelcraft installed a hand scanner on the time clock.   (Privett Dep. 34, Page ID #
6490.)   Privett testified that Steelcraft occasionally experienced problems with the hand scanner.
(Privett Dep. 34, Page ID # 6490.)   When such a problem occurred, employees could manually
type their clock number into the time clock.   (Becker Suppl. Decl. ¶ 9, Page ID # 3010.)

Pursuant to the no fault Attendance Policy in place at the time of Gillett's termination,
Steelcraft employed a point system to discipline Union employees with regard to attendance
problems, such as unexcused absences.   (Carter Dep. 87–88, Page ID # 5334–35; Parson Decl. re:
Gillett ¶ 14, Ex. C, Page ID # 634, 686–88.)   The policy specified that everyone "started at Zero
(0) points on September 2, 2001."   (Parson Decl. re: Gillett Ex. C ¶ 1, Page ID # 686.)   All
absences fell within one of two categories, "Excused" or "Unexcused."   (*Id*. Ex. C ¶ 3, Page ID #
686.)   Excused absences included approved paid absences (e.g., vacations, holidays,
bereavement, and jury service), absences due to industrial injury, and approved unpaid absences
(e.g., personal leave as permitted under the CBA, approved FMLA leave, and leave related to
Union Business).   (*Id*.)   As directed by   the "Attendance Reporting Procedure," employees were
required to report all absences, whether excused or unexcused, no later than two hours after the
start of their scheduled shift.   (*Id*. Ex. C ¶ 2, Page ID # 686.)

When an employee took unexcused leave but complied with the reporting procedure, only
one point was assigned for a full absence (defined as any absence in which the employee worked
less than two hours of the scheduled shift).   (*Id*. Ex. C ¶¶ 2, 4, Page ID # 686–87.)   If, however,

34

the employee did not comply with the reporting procedure, one and a half points were assigned for each full unexcused absence.   (*Id*. Ex. C ¶¶ 2, 5, Page ID # 686–87.)   Generally, only a half of a point was assigned when the employee, without authorization, arrived late or left early but worked at least two hours of the scheduled shift.   (*Id*. Ex. C ¶ 6, Page ID # 687.)   Employees who were late or left early more than twice in one calendar month received one full point each time they arrived late or left early thereafter in that month.[15]   (*Id*. Ex. C ¶ 6, Page ID # 687.)   In addition to earning points for poor attendance, employees could reduce their points through good attendance. Specifically, the policy provided that when an employee had 100% attendance for any given calendar month, one point would be removed from his or her record.   (*Id*. Ex. C ¶ 11, Page ID # 688.)

Attendance point slips typically were presented to Union employees each time they were assigned a point (*see* Mullins Dep. 33, Ex. 3; Page ID # 5037, 5112–5243), and progressive discipline was applied as an employee accumulated points (Parson Decl. re: Gillett ¶ 14, Ex. C ¶ 9, Page ID # 634, 688).   Specifically, employees received a verbal reprimand anytime they reached six points, a written reprimand when they reached nine points, and a zero-day suspension when they reached twelve points.   (*Id*. ¶ 14, Ex. C ¶ 9, Page ID # 634, 688; Mullins Dep. 22, Page ID # 5026.)   An employee who accumulated fifteen points was subject to termination.   (Carter Dep. 87–88, Page ID # 5334–35; Parson Decl. re: Gillett ¶ 14, Ex. C ¶ 9, Page ID # 634, 688; Gillett Dep. 65–66, Page ID # 4727–28.)   Aside from Gillett, Steelcraft terminated eight other employees from 2009 through September 2011 due to violations of Steelcraft's Attendance Policy.   (Parson Decl. re: Gillett ¶ 15, Page ID # 634.)

---

[15]   Additional rules regarding the assignment of points are included in the Attendance Policy.   (Parson Decl. re: Gillett Ex. C, Page ID # 686–88.)

Team leaders were responsible for monitoring the day to day attendance of the Union employees they supervised.  (Becker Suppl. Decl. ¶ 11, Page ID # 3011.)   Team leaders received daily time clock information for their employees, and based on that information, they assigned points as directed by the Attendance Policy and notified both the employee and Mike Becker, Steelcraft's HR Coordinator, of the points assigned.   (*Id.* at ¶¶ 11–12, Page ID # 3011.) Ultimately, Becker was responsible for the long term tracking and monitoring of Union employee attendance points under the Attendance Policy.[16]   (Parson Decl. re: Gillett ¶ 17, Page ID # 635; Becker Decl. ¶¶ 1, 7, Page ID # 873–74; Becker Suppl. Decl. ¶ 12, Page ID # 3011.)   Anytime an employee received a point under the Attendance Policy, he or she had the right to dispute the point by filing a Union grievance.   (Becker Suppl. Decl. ¶ 12, Page ID # 3011.)

Whenever an employee accumulated fifteen or more points, Becker gathered all of the attendance write-ups, and he and Parson reviewed the employee's record to verify accuracy. (Parson Decl. re: Gillett ¶ 17, Page ID # 635; Becker Decl. ¶ 7, Page ID # 874.)   If Becker and Parson found that the points were assigned in proper accordance with the Attendance Policy, the employee was subject to discharge. (*Id.*)   When an employee was discharged for attendance points, the entire attendance file was provided to the Union, which then reviewed the file to double check its accuracy.   (Parson Decl. re: Gillett ¶ 18, Page ID # 635; Mullins Dep. 34–35, Page ID # 5038–39.)   If the Union believed points had been assigned incorrectly, the Union could pursue arbitration.   (Mullins Dep. 36–37, Page ID # 5040–41.)

---

[16] Becker has held the position of HR Coordinator since 2000.   (Becker Decl. ¶ 2, Page ID # 873.)

Gillett's attendance records show that he accumulated points as follows between the years 2002 and 2009:

| YEAR | BEGINNING BALANCE | POINTS ACCRUED FOR POOR ATTENDANCE | POINTS DEDUCTED FOR GOOD ATTENDANCE | END BALANCE |
|------|------|------|------|------|
| 2002 | 0 | 8.5 | 0 | 8.5 |
| 2003 | 8.5 | 2.5 | 6 | 5 |
| 2004 | 5 | 10 | 5 | 10 |
| 2005 | 7[17] | 6 | 4 | 9 |
| 2006 | 9 | 6.5 | 6 | 9.5 |
| 2007 | 9.5 | 8 | 7 | 10.5 |
| 2008 | 10.5 | 3.5 | 8 | 6 |
| 2009 | 6 | 11.5 | 2 | 15.5 |

(*See* Mullins Dep. Ex. 3, Page ID # 5138–45.)

Gillett testified that he understood the attendance requirements and progressive discipline procedure set forth in the Attendance Policy.  (*See* Gillett Dep. 51–52, 65–66, Page ID # 4713–14, 4727–28.)  Of the approximately eighty-seven daily slips documenting each point accrued by Gillett since November 2002, he signed all but three.  (Mullins Dep. Ex. 3, Page ID # 5112–5243.)  In addition to the daily attendance slips, Gillett received many verbal and written attendance warnings throughout his employment.  (Gillett Dep. 65, Page ID # 4727; Mullins Dep. Ex. 3, Page ID # 5112–5243.)  During the eight months preceding his October 28, 2009 termination, Gillett received a verbal warning in February, a written warning in August, and a

---

[17]  For some reason unknown to the Court, despite ending 2004 with a balance of ten points, Gillett's records indicate that he began 2005 with a balance of seven points.  (*See* Mullins Dep. Ex. 3, Page ID # 5138–45.)

zero-day suspension in early October, all imposed due to Gillett's accumulation of points under the Attendance Policy.   (Gillett Dep. 65, Page ID # 4727; Mullins Dep. Ex. 3, Page ID # 5117–19.) Gillett ultimately was discharged after he accumulated fifteen attendance points, most of which were related to him arriving late to work.   (Gillett Dep. 65–67, Page ID # 4727–29.)   Due to Gillett's allegations that the hand scanner on the time clock occasionally malfunctioned, Becker reviewed Gillett's attendance points for 2009 and confirmed that the scanner was working properly when he received those points.   (Becker Suppl. Decl. ¶¶ 8–9, Page ID # 3010.)

Gillett admits both that he understood the accumulation of fifteen points would lead to his discharge (Gillett Dep. 69, Page ID # 4731), and that he did in fact accumulate points sufficient to justify his discharge as a result of repeated lateness or absence:

> Q. So you were — and just so we're clear as to the attendance points, and I'll show you the documents, but as to the points, you're not disputing that you actually missed work and you got points that led to your discharge?
> A. No.
> Q. Okay. Your issue is why you were missing work. You're saying you were missing work for legitimate reasons and that's what you're arguing?
> A. Yes.

(*Id*. at 52, Page ID # 4714).   Though Gillett claims "was doing his best to get [to work] on time" (*id*. at 70, Page ID # 4732), he admits that he was often "a minute or ten minutes late" to work (*id*. at 66, Page ID # 4728).   Gillett also conceded that he was properly assigned half-points for those late arrivals:

> Q. And you're not saying that you shouldn't have gotten a half point? You were late, right, and per the policy negotiated with the union, you're supposed to get a half point if you're late. Right?
> A. Correct.

(*Id*. at 67, Page ID # 4729.)

The decision to discharge Gillett was made by Parson and Becker.   (Becker Suppl. Decl. ¶

6, Page ID # 3010.)   Both men maintain Gillett's discharge was done pursuant to and consistent

with the Attendance Policy.   (Parson Decl. re: Gillett ¶ 19, Page ID # 635; Becker Decl. ¶ 12, Page

ID # 875.)   They maintain that they treated Gillett no differently than any other Steelcraft

employee and that "neither [Gillett's] religion nor any other improper reason played a role in any

decision or action that" they took, including the decision to terminate Gillett.   (Parson Decl. re:

Gillett ¶¶ 19, 23, Page ID # 635–36; Becker Decl. ¶¶ 12, 14, Page ID # 875.)

    Upon Gillett's termination, pursuant to the general procedure described above, Steelcraft

provided the Union with Gillett's full attendance file, which totaled approximately 130 pages.

(Parson Decl. re: Gillett ¶ 20, Page ID # 635; Mullins Dep. Ex. 3, Page ID # 5112–5243.)   Gillett

filed a grievance through the Union alleging he was unjustly discharged.   (Gillett Dep. 49, Page

ID # 4711; Parson Decl. re: Gillett ¶ 20, Page ID # 635; Mullins Dep. 35–36, Page ID # 5039–40.)

He did not, in that grievance, make any express allegation of discrimination or harassment.

(Carter Dep. 176–77, Page ID # 5423–24.)   Nor did he reference his religion.   (*Id*.)   The Union

ultimately withdrew that grievance after verifying the accuracy of Gillett's attendance record.

(Mullins Dep. 36, Page ID # 5040.)

### b.    Analysis

    Beginning with the prima facie factors, the Court notes that Gillett's largest problem lies in

the fourth factor, as Gillett fails to present any evidence that Steelcraft applied its attendance

policy differently to non-Jewish employees. Throughout the depositions and the briefing,

Plaintiffs' counsel repeatedly compares Gillett, a Jewish Caucasian male, to other Caucasian

males without reference to the comparators' religious status.   In doing so, counsel conflates

religion with race.   Gillett did not bring a race discrimination claim, and if he had, the proper

comparators surely would not be individuals of his own race.

Even assuming for the sake of analysis that Gillett could establish a prima facie case of disparate treatment discrimination, Defendant nonetheless would be entitled to summary judgment.   As discussed above in great detail, Defendant set forth an abundance of evidence describing the nature of its attendance policy and demonstrating the manner in which it is enforced.   Gillett's attendance violations are well-documented, and there is no question but that his termination was a direct result of his accumulation of fifteen attendance points.

Gillett's attempt to demonstrate pretext by showing that the attendance policy was enforced arbitrarily is fruitless.   For example, Gillett focuses on the alleged problems with the hand scanner used to record an employee's arrival time.   However, the evidence, even when viewed in a light most favorable to Gillett, shows that problems with the scanner were minimal, there were alternative methods for documenting attendance when the scanner failed, and scanner failure did not affect Gillett's record.   In addition to pointing to the scanner problems, Gillett claims that other employees sometimes did not get points for arriving late because they lied and told their bosses that they had arrived on time but had forgotten to clock in or they claimed that there were problems with the time clock.   (Gillett Dep. 66, 78, 97, Page ID # 4728, 4740, 4759.) Gillett has not identified those employees, and he admits that he never saw other employees attendance records, but he claimed some people bragged when they were able to avoid getting attendance points for late arrivals.   (*Id*. at 78, Page ID # 4740.)   Gillett elected not to lie about his tardiness because he knew that he could be discharged for dishonesty if he was caught not telling the truth.   (*Id*. at 97, Page ID # 4759.)   Even if true, those allegations do not evince an arbitrary application of the attendance policy on the part of Steelcraft management.   Instead, they merely show that some employees found a way to cheat the system by lying to their supervisors.   Gillett could have done the same, but he chose to remain honest.

40

Gillett also argues that he did not actually have fifteen points at the time of his termination because two of the points were under dispute and were the subject of group grievances filed by the Union.   The disputed points relate to an incident in July 2007 when Gillett and a number of other employees refused to work a particular shift because they believed it would require overtime and another incident in 2009 when Gillett and several other employees were absent from work due to a snow emergency.   (*See* Doc. 62-1 at 6−8, Page ID # 2019−21.)   Gillett does not dispute that he was assigned points for those events or that at the time of his termination, his attendance record showed that he had fifteen points.   Nor does he contend that the disputed points were assigned in a discriminatory manner.   To the contrary, the fact that attendance points appear to have been assigned to all employees who did not work their required shifts on those days, hence the resultant *group* grievances, evinces an intent to treat employees uniformly.   Without any evidence that the points were assigned in a discriminatory manner, any argument that the disputed absences should have been excused under the CBA is not a proper subject for a religious discrimination lawsuit. *See Tingle*, 692 F.3d at 530 ("[A] case alleging unlawful retaliation [under Title VII] is not a vehicle for litigating the accuracy of the employer's grounds for termination.").

Finally, the Court notes that Gillett's general testimony that the reason for his persistent lateness was that he dreaded going to work as a result of the alleged "anti-Semitic comments" being made by his co-workers and other problems he had, both of which are discussed in greater detail below, is not enough to create a question of fact as to whether his religion was a motivating factor in Steelcraft's decision to terminate him.   (Gillett Dep. 67, Page ID # 4729.)   Gillett's testimony may be probative of whether the harassment he alleges was sufficient to alter the terms and conditions of his workplace, as discussed below.   However, he does not allege that either Parson or Becker, the individuals who were responsible for reviewing his attendance and who

41

ultimately decided to terminate him, were involved in that harassment. Nor does he present any evidence that attendance points were assigned improperly as a form of harassment. As there is absolutely no evidence that Gillett's termination resulted from anything other than the routine and uniform application of Steelcraft's attendance policy, the Court grants summary judgment to Defendant as to any discrimination claim related to Gillett's termination.

### C. Hostile Work Environment Claims

Having disposed of the disparate treatment portions of Plaintiffs' discrimination claims, the Court turns next to Plaintiffs' hostile work environment allegations. Younger claims he suffered from a hostile work environment stemming from race-related harassment and discrimination, while Gillett alleges the same with regard to his religion. Based on the evidence submitted at this stage, the Court easily can conclude that Plaintiffs are not entitled to summary judgment on their hostile work environment claims. The more difficult question is whether Defendant is entitled to summary judgment as to those claims. Though the case is close, the Court finds that Plaintiffs identify just enough evidence to create triable questions of fact precluding a grant of summary judgment to Defendant.

### 1. Legal Standard

Generally, the same standards are utilized to analyze hostile work environment claims brought under Ohio law as are applied to those brought under Title VII, and courts often rely on federal law interpreting Title VII when addressing Chapter 4112 claims. *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 740 (N.D. Ohio 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm.*, 66 Ohio St.2d at 196, 421 N.E.2d at 128); *Hampel*, 89 Ohio St. 3d at 175, 729 N.E.2d at 731. Under both statutes, to establish a case of a hostile work environment, a plaintiff must show: (1) that he was a member of a protected class; (2) that he was subjected to

42

unwelcome harassment; (3) that the harassment was based on a protected characteristic like race or religion; (4) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) that an employer is liable for the creation of that environment. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). A hostile work environment is a workplace "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Kelly v. Senior Centers, Inc.*, 169 F. App'x 423, 428 (6th Cir. 2006) (quoting *Harris*, 510 U.S. at 21). Such claims have "both objective and subjective components." *Russell v. Univ. of Toledo,* 537 F.3d 596, 608 (6th Cir. 2008).

Defendant focuses on the fourth prong of that test, arguing that the evidence in this case does not reveal harassment that was severe or pervasive enough to amount to a hostile work environment that interfered with the Plaintiffs' ability to perform their jobs. Over the past few decades, the Sixth Circuit has identified a number of important principles for courts to follow when determining whether alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. First, the court "must consider the totality of the circumstances, and not discrete events in isolation." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (internal quotation marks omitted). "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) *(quoted in Jackson v. Quanex Corp.,* 191 F.3d 647, 659 (6th Cir. 1999)). Factors to be considered in determining whether a work environment is hostile from an objective point of view include "the frequency of the harassment; its severity;

43

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "'A recurring point' in the Supreme Court's opinions is that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment' and that 'conduct must be extreme to amount to [such] a change.'" *Hafford*, 183 F.3d 506, 512–13 (6th Cir. 1999) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Second, "offensive conduct need not be directed at the plaintiff." *Ladd*, 552 F.3d at 500 (citing *Jackson*, 191 F.3d at 660).   However, whether the plaintiff or another individual was the target of the conduct is relevant to the determination of the severity of the conduct when judged in relation to the plaintiff.   *See id.* at 501 (concluding that the fact that certain derogatory comments were not directed at the plaintiff diminished the severity of the comments).

Third, "the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand." *Ladd*, 552 F.3d at 500 (citing *Jackson*, 191 F.3d at 661).   "Indeed, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment." *Jackson*, 191 F.3d at 661 (internal quotation marks omitted).   The key is whether the plaintiff was aware of the conduct during the time period of which plaintiff complains, as opposed to simply learning of the conduct during the course of pursuing legal recourse.   *See Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012) ("In short, a plaintiff does not need to be the target of, or a witness to harassment in order for us to consider that harassment in the totality of the circumstances; but he does need to know about it."); *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 262 (6th Cir. 2001) (The "plaintiff must have been aware of [the alleged] incidents during her employment,

44

even if indirectly, for the accounts of others to be relevant."); *Wilson v. Dana Corp.*, 210 F. Supp. 2d 867, 878 (W.D. Ky. 2002) ("[T]he fact that the challenged conduct must be examined on both an objective and subjective basis also requires that the plaintiff must at least have been aware of the harassment while employed by the defendant").   The Sixth Circuit has explained in the following manner the reasoning behind the requirement that evidence must be known to the plaintiff individually in order to be probative of that particular plaintiff's alleged subjection to a hostile work environment:

> In *Harris*, the Supreme Court formulated the objective part of the inquiry not as addressing whether an objectively hostile work environment existed beyond the plaintiff's knowledge, but instead as asking whether a reasonable person would find the discriminatory conduct hostile or abusive.   510 U.S. at 21–22.   In discussing the objective standard, the Court in defining an objectively hostile work environment, took "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."   *Id.* at 21.   Thus, the Court's focus in the objective part of the inquiry is on determining what type of conduct would actually "alter the conditions of the victim's employment and create an abusive working environment."   *Id.* (internal quotations and citations omitted).

*Armstrong v. Whirlpool Corp.*, 363 F. App'x. 317, 328–29 (6th Cir. 2010).

Fourth, the principle discussed above applies with equal force to the experiences of co-plaintiffs.   In other words, where a case involves multiple plaintiffs suing the same employer, the court must consider the allegations and experiences of each plaintiff separately, and cannot merely attribute the experiences or knowledge of one plaintiff to other plaintiffs by virtue of the fact that they have chosen to bring their claims together in a single lawsuit.   *See Berryman*, 669 F.3d at 717–18 (clarifying that a group of plaintiffs may not aggregate all of their claims unless there is evidence that they were aware of one another's experiences); *Armstrong*, 363 F. App'x. at 324–29 (considering the claims of each plaintiff separately based on the experiences and knowledge of each particular plaintiff).

45

Finally, "racial or [religious] animus can be inferred from conduct not overtly racial or [religious] in nature *when the context suggests it*," and "blue collar work environments do not have more leeway when it comes to offensive conduct."   *Ladd*, 552 F.3d at 500 (citing *Jackson*, 191 F.3d at 662) (emphasis added).

The analysis of whether any given set of facts is sufficient to establish the existence of a hostile work environment is extremely nuanced and case-specific.   A particularly instructive example is *Armstrong*, 363 F. App'x. at 319, which involved the hostile work environment claims of five current and former African-American employees of Whirlpool, all of whom had worked for the company for close to two decades.   *Id*. at 318.   In that case, the district Court had granted summary judgment for the defendant as to four of the employees — Louvenia Armstrong, Henry Beasley, Larsen Cash, and Betty Talley — on the basis that those plaintiffs had not created a fact question as to whether their work environments were objectively hostile.   *Id*.   The employees appealed that decision, and the Sixth Circuit ultimately reversed the district court's ruling as to Armstrong, Beasley, and Cash, but not as to Tally.   *Id*. at 319.   In doing so, the Court provided a detailed description of the evidence relevant to each plaintiff's individual harassment claim, as summarized herein:

<u>Armstrong</u>

Armstrong alleged witnessing a particular co-worker, Dale Travis, frequently make derogatory comments such as "ni****" and "uppity ni****," make jokes about African-Americans, and refer to African-Americans as "white boys."   *Id*. at 319–20.   On one occasion, she also heard Travis say that African-Americans should "stay with their own kind."   *Id*. at 319.   She heard another co-worker refer to African-Americans as lazy, use the phrase, "may the klan be with you," and state that "he was going to tell his KKK buddies about-about us."   *Id*. at

46

320.   Yet another co-worker constantly referred to her as "gal," a term she believed held racist connotations.   *Id*.   In addition to recalling those derogatory comments, she also described one incident in which a number of Caucasian workers wore pins bearing the image of the Confederate flag, and another incident in which a Caucasian supervisor threw out a cake that an African-American employee had made.   *Id*.   Finally, she claimed she had learned that there was racist graffiti at the plant, though she had never seen it.   *Id*.

Beasley

Like Armstrong, Beasley focused heavily on Travis's behavior, testifying that Travis repeatedly made racially offensive comments, including calling African-American employees "ni****," "white boy," and other derogatory terms.   *Id*. at 321.   Travis' behavior continued even after Beasley reported him to a supervisor.   *Id*.   In addition to his testimony concerning Travis, Beasley testified that other co-workers and supervisors regularly make racist jokes, and he described one particular incident in which he overheard two co-workers state that an African-American man who had been dragged to his death behind a pick-up truck in Texas "probably deserved it."   *Id*.   Aside from hearing such comments, Beasley also claimed the restrooms at the Whirlpool facility were full of racist graffiti, such as the letters "KKK."   *Id*.   He testified that he complained about the graffiti in 2003 or 2004, but the company did not remove it until sometime in 2005, after the filing of the lawsuit.   *Id*.   Finally, he also claimed to have observed a spare truck with graffiti showing the image of a person with a rope around his neck, and he stated that he was aware that an African-American employee had once found manure on a truck that she used during her shift.   *Id*.

Cash

Cash's experiences were on par with those of Armstrong and Beasley.   Cash also

47

witnessed Travis make racist comments such as those described above.  *Id*. at 322.  He claimed

that Travis taunted African-American employees on a daily basis, and that he made statements

like, "white people had better watch out, there's a bunch of ni***** taking over."  *Id*.  Cash

testified that he and others had complained of Travis' behavior, but that no action was taken.  *Id*.

Additionally, Cash recalled at least two occasions when supervisors addressed him by the name

"boy" or "big boy," and he claimed that one supervisor had constantly referred to

African-American men as "boys."  *Id*.  He had heard second-hand that a manager had said of

another African-American employee, "that's my ni****, ain't that right boy?   That's my ni****."

*Id*.  He described the same cake incident recalled by Armstrong, but in greater detail, claiming

that he had also heard that the Caucasian supervisor who threw out the cake stated that "he didn't

want no cake no ni**** had made."  *Id*.  Cash also had heard that a co-worker called an

African-American employee a sand head or a rag head, and he had witnessed a white group leader

call African-American women "ni*****."  *Id*.  Lastly, like Beasley, Cash had regularly observed

racially offensive graffiti in the plant, which he described in detail and about which he had

complained on several occasions.  *Id*.  He claimed that some of the graffiti had been on the wall

for the entire nineteen years that he worked at the facility.  *Id*.

Talley

Talley gave conflicting testimony concerning the extent of her exposure to racially

derogatory comments.  *Id*. at 320.  Initially, during her deposition, she stated that she "had

neither heard another employee call an African-American employee a racially offensive name at

work nor been called a racially offensive name at work herself."  *Id*.  Later, however, she

testified that she had heard Travis say to another employee, "hey you black mother fu****," that

she had heard Travis call Beasley an "uppity ni****," and that she had learned second-hand that

48

Travis had called Beasley a "yellow ni****" and a "redhead ni****," that Travis had said that

Beasley wanted to be white, and that Travis had called another co-worker a "black bitch."   *Id*.

She also stated that Travis had made comments like, "may the klan be with you," "we needed a

James Earl Ray Day," and African-Americans should stay with their own kind.  *Id*.   Finally,

"Talley claimed that she had heard Travis refer to co-workers who spoke with her as 'ni****

lovers.'"[18]  *Id*.   As to other employees, Talley stated that "a Caucasian employee named Quiggle

had 'talked about any race that wasn't white' and had 'told dirty jokes' in the presence of

supervisors who had done nothing in response."   *Id*.

 Like Beasley and Cash, Talley claimed to have observed racist graffiti while working at the

warehouse.   *Id*.   However, the graffiti she observed was on the inside of trailers that she unloaded

rather than on the walls of the plant, and she did not know whether the trailers belonged to

Whirlpool.   *Id*.   Furthermore, in contrast to Beasley's and Cash's experiences, she claimed that

her supervisor spray painted over the graffiti as soon as it appeared.   *Id*.

 In comparing the experiences of the four plaintiffs, the Sixth Circuit ultimately concluded

that unlike Armstrong, Beasley, and Cash, Talley had not presented enough evidence to

demonstrate that she had suffered from a racially hostile work environment.   In reaching that

conclusion, the court focused on the following distinctions:

> Talley's claims are similar to those of Armstrong, Beasley, and Cash, but they
> differ in at least two important respects. First, Talley's allegations concerning the
> harassment by Dale Travis are more general than those of her co-plaintiffs.
> Although she did allege that "Dale did his stuff on a daily basis," Talley's
> allegations of continuous harassment concerned "bad language" and "cussing in
> general" directed at all employees, rather than specific racial harassment of
> African-American employees.   Second, although Talley also alleged that she

---

[18]  Talley also stated that Travis often cursed or yelled at his co-workers and walked away
from his line duties without repercussion.   *Id*. at 320.

personally had observed racist graffiti on the inside of trailers she unloaded during her employment, she also testified that this graffiti had been painted over each time as soon as she reported it to her supervisor.   The district court correctly classified Talley's allegations of discrimination as a handful of uses of the n-word and its derivatives, primarily by Travis, some racist jokes by Quiggle, a few references by Travis to the Ku Klux Klan and James Earl Ray, and the presence of racist graffiti that was removed as soon as [Talley] reported it to a supervisor. Even considering these incidents together in the totality of the circumstances of which Talley was aware, the alleged harassment was not severe or pervasive enough to alter the conditions of Talley's employment.

*Id*. at 327.   The Sixth Circuit's decision demonstrates how fine the line is in deciding what constitutes an actionable hostile work environment and whether an employee has set forth sufficient evidence to survive summary judgment on such a claim.

In reviewing the facts of the instant case and applying the principles described above, the question for this Court is whether Younger's and Gillett's experiences are more in line with those of Armstrong, Beasley, and Cash or with Talley.

### 2.    Admissible Evidence

Both Younger and Gillett presented a large volume of evidence documenting the testimony of numerous current and former Steelcraft employees who claim to have witnessed or experienced discrimination or harassment on the basis of race or religion while at Steelcraft.   The Court has reviewed in depth each and every one of the affidavits and depositions relied upon by the parties, and in doing so found a disturbing number of allegations of inappropriate conduct that, if true, suggests that many African-American employees of Steelcraft have experienced harassment or mistreatment on the basis of their race to one degree or another.   However, there is no evidence that Younger or Gillett had any knowledge of the vast majority of those employees' experiences until after conducting discovery as part of this lawsuit.   While it may be appropriate to take the experiences of a plaintiff's co-workers into account when determining whether the environment in

50

which the plaintiff worked may be characterized as hostile where there is evidence that the plaintiff

had knowledge of his co-workers' experiences prior to filing a lawsuit, it would not be appropriate

to permit that plaintiff to essentially create a hostile work environment by seeking out examples of

discrimination and harassment during the discovery process.   Accordingly, this Court must

disregard most of the accounts provided by Plaintiffs' co-workers.   Similarly, Gillett testified to

several incidents in which he witnessed racially offensive conduct concerning or targeted toward

African-Americans which this Court cannot consider with regard to Younger's hostile work

environment claim as there is no evidence that Younger also witnessed or was aware of much of

that conduct prior to learning of it through the course of this lawsuit.   As explained above, the

Court cannot merely attribute the Plaintiffs' separate knowledge and experiences to each other by

virtue of the fact that they decided to bring their claims together in one lawsuit.

### 3.    Younger

When the irrelevant evidence is stripped away, the harassment that Younger either

personally witnessed or was aware of boils down to the following:

- Younger testified that there was, for a number of years, racist and anti-Semitic graffiti on
Steelcraft's bathroom walls.   (*See* Younger Dep. 46, 48, 105, PAGE ID # 4585, 4587, 4644.)

Younger stated in his affidavit that "racist KKK and Swastika graffiti" was present on the walls of

Steelcraft bathrooms from 2000 to 2009 and that he saw that graffiti every time he used a company

bathroom.   (Younger Aff. ¶ 12, Page ID # 2215.)   During his deposition, Younger clarified that

he has seen racist graffiti, including the "N word" and Swastikas, in two of the main restrooms on

the workshop floor.   (Younger Dep. 46, 48, PAGE ID # 4585, 4587.)   He does not know who was

responsible for the graffiti.   (*Id*. at 48, PAGE ID # 4587.)   Younger claims to have complained to

Parson, Privett, and Durbin about the graffiti.[19]    (*Id.* at 48, 105, PAGE ID # 4587, 4644.)

Younger's testimony on that point is corroborated by Gillett, who stated that he witnessed

Younger inform Privett and other supervisors of the graffiti.    (Gillett Aff. ¶ 6, Page ID # 2227.)

Despite his complaints, Younger testified, the graffiti remained on the walls for a long period.

(Younger Dep. 105, PAGE ID # 4644.)    Steelcraft painted over the graffiti sometime in or around

February or March 2009.    (*Id.* at 49, PAGE ID # 4588.)    Younger has not seen any new graffiti

since that time.    (*Id.*)

- Younger was aware of, but did not personally witness, an incident in which Gillett claims

to have caught Parker and Privett looking at a KKK website while at work.    (*See* Gillett Dep.

59-60, Page ID # 4721–22.)    It is unclear from the evidence cited by the parties exactly when this

incident occurred.    At some point after the incident, Gillett told Younger about what he had seen.

(Gillett Dep. 72, Page ID # 4734; Younger Dep. 44–45, Page ID # 4583–84.)    Though he did not

actually witness the incident (Younger Dep. 44, Page ID # 4583), Younger made an anonymous

complaint through the hotline, and he told Carter, who was at that time serving as the Union

President, about the incident.    (*Id.* at 45, Page ID # 4584; Carter Dep. 28, Page ID # 5276.)    The

Union informed Parson of the incident, though no one told him that either Younger or Gillett were

---

[19] He also testified that he had seen management employees, including Privett, use the bathrooms in which he had seen the graffiti.    (Younger Dep. 103, Page ID # 4642.)    Privett denied ever having seen any of the alleged racist graffiti.    (Privett Dep. 55, Page ID # 6511.)    The Union has no record of any grievances being filed relating to graffiti in the plant, (Mullins Dep. 27–28, Page ID # 5031–32; Carter Dep. 9–10, Page ID # 5257–58), and Carter recalled being advised on only one occasion that racist graffiti was present in a Steelcraft bathroom (Carter Dep. 10–12, Page ID # 5258–60).    Specifically, Carter remembered that in or around 2004, an African-American employee, Kenny Winford, showed him that someone had written the "N word" in one of the bathroom stalls.    (Carter Dep. 10–11, Page ID # 5258–59.)    In response, Carter requested and was granted permission from his team leader, Charlie Strassenger, to paint over the offensive graffiti.    (Carter Dep. 11, Page ID # 5259.)

involved in any way, and both Steelcraft and the Union conducted an investigation.  (Parson Decl. re: Younger ¶ 21, Page ID # 422; Carter Dep. 28, Page ID # 5276.)  Parson ordered that Privett's computer be examined by computer experts in Blue Ash and at Steelcraft's headquarters, but the experts could not verify the Union's accusation.  (Parson Decl. re: Younger ¶ 21, Page ID # 422; Parson Dep. 177, 179, Page ID # 7995, 7997.)  During his deposition, Parson acknowledged the possibility that no evidence was found because Privett may have been using another Team Leader's computer:

> [E]very computer is assigned to a specific team leader, and you have to have a pass code to get in there.  Now, if there was a computer left open, which is against company policy, I don't know that.  All I did was tell the IT department to go get Jeff Privett's computer.

(Parson Dep. 179, 202, Page ID # 7997, 8020.)

• As described in greater detail in the discussion above of Younger's suspensions, Younger had ongoing problems with Parker, which Younger believes were caused at least in part by Parker's known racist opinions.[20]  Younger alleges that Parker falsely accused him of making threats resulting in Younger's eventual suspension, broke into his locker, and slashed his tires.[21]

---

[20] Several of Younger's co-workers, including Gillett, indicated that they have heard Parker express negative views about African-Americans.  (*See e.g.*, Gillett Dep. 72–74, Page ID # 4634–36; Gast Dep., 21–22, 28–29, Page ID # 5622–23, 5629–30; Ritchie Aff. ¶¶ 6–7, 9, Page ID # 1123; Tracy Dep. 19, Page ID # 6084.)  However, there is no evidence that those individuals shared what they heard with Younger.

[21] The 2009 incident in which Younger's tires were slashed occurred while Younger was at work, but while Younger's car was parked on a public street.  (Younger Dep. 55, 57, Page ID # 4594, 4596; Parson Decl. re: Younger ¶ 20, Page ID # 422; Younger Aff. ¶ 17, Page ID # 2216.)  Younger believes, based on information given to him by Parker's ex-girlfriend, Laura Gast, that Parker was responsible.  (Younger Dep. 33, Page ID # 4572.)  He reported the incident to the police and to Steelcraft, and Parson investigated the matter on behalf of Steelcraft, but neither the police nor Parson could determine who was responsible.  (Parson Decl. re: Younger ¶ 20, Page ID # 422; Younger Dep. 55, Page ID # 4594.)  The Union also conducted its own investigation, with similar results.  (Carter Dep. 19–20, Page ID # 5267–68.)  Laura Gast did testify that sometime

(Younger Dep. 29, Page ID # 4568.)   With regard to the locker incident, Younger claims that

although he did not personally witness Parker break into his locker, he was told by other Union

employees that Parker was responsible and he had previously seen Parker break into other

employee's lockers.   (*Id*. at 33, Page ID # 4572.)   Younger also claims that in 2009, Parker

sabotaged his work product by putting dents and small holes on the corners of the door frames

Younger was working with in order to prevent him from meeting his company production quota.

(Younger Aff. ¶ 17, Page ID # 2216.)

　　　Aside from the incident in which Gillett saw Parker and Privett looking at a KKK website

and the incident in which Parker brought a refrigerator into the plant and allowed only white

employees to use it, Younger recounts one other situation in which he witnessed or was aware of

Parker engaging in openly racist behavior or made racist comments toward him or other

employees. Specifically, Younger testified that in 2009, Parker allegedly brought a refrigerator

into the workplace and would not permit African-American employees to use it.   (Younger Dep.

77–78, Page ID # 4616–17.)

　　　One of Younger's co-workers, Frank Blue III, submitted an affidavit in which he describes

witnessing a dispute between Younger and Parker.   Blue alleged that one day in June 2009, while

he was discussing an issue with Younger, Parker approached Younger and demanded he "get back

---

in 2010, a year after the incident occurred, Parker allegedly told her that he was responsible for
slashing Younger's tires in 2009.   (Gast Dep. 17–19, Page ID # 5618–20.)   Gast reported this
confession to Parson.   (*Id*. at 19–20, Page ID # 5620–21.)   Both Gast and Parson recall Parson
asking her if she was willing to provide a written statement describing Parker's confession.   (*Id*. at
19–20, Page ID # 5620–21; Parson Dep. 205, Page ID # 8023.)   Gast said she would, but then
never gave Parson a written statement.   (Parson Dep. 205, Page ID # 8023.)   As a result, Parson
claims, he did not pursue the matter.   (*Id*.)

to work." (Blue Aff. ¶ 6, Page ID # 1104.) Younger explained that he and Blue were discussing a work-related issue, and told Parker that he had no authority to prioritize Younger's work schedule. (*Id*.) At that point, according to Blue, Parker was visibly upset, and he stated "I have a permit to carry," which Blue understood to mean that Parker had a gun. (*Id*.) In his affidavit, Blue claimed that he believed Younger reported the incident to Parson, but during his deposition, he admitted that he has no personal knowledge of whether Younger reported the incident and when specifically asked again if Younger reported this incident to human resources, Blue responded, "I don't believe he did." (*Id*. ¶ 6, Page ID # 1104; Blue Dep. 101–02, 103, Page ID # 6751–52, 6753.) Contrary to what Blue represented in his affidavit, the incident he described could not have taken place in June 2009, because Blue was laid off sometime in February 2009 and did not return to Steelcraft until July 13, 2009. (*See* Blue Dep. 27, 45, Page ID # 6677, 6695.) Furthermore, it appears from Blue's testimony that he did not work with Younger between July 2009 and October 2009, when he was laid off again, as Blue worked the second shift during that period and he had acknowledged that the only time he worked with Younger was when he worked the first shift. (*Id*. at 29, Page ID # 6679.) Accordingly, it is not clear when the "permit to carry" incident took place. Younger described a dispute between him and Parker that occurred in July 2009, close to the date of his first suspension, during which Parker attempted to tell Younger to get back to work, but Younger said nothing about Parker stating he had a permit to carry. (*See* Younger Dep. 65–66, Page ID # 4604–05.)

• Younger made inconsistent statements regarding the extent to which any Steelcraft employees have made racist comments to him during the course of his employment. When first asked about such comments during his deposition, he indicated that no supervisors or Union employees have made racist comments directly to him. (*Id*. at 30–31, Page ID # 4569–70.)

55

Later during his deposition, he testified that in 2007, one of his co-workers, Laura Gast, called him a "ni\*\*\*\*." (*Id*. at 52–53, Page ID # 4591–92.)   Younger complained of the incident to Privett, but he does not believe Steelcraft ever investigated the complaint.   (*Id*. at 52–54, Page ID # 4591–93.)   Though it is unclear whether he is referencing the same or a separate incident, one of Younger's co-workers, Nate Lomax, testified that he heard a white employee use the "N word" in reference to Younger on one occasion in or before 2007. (Lomax Dep. 101–104, Page ID # 7244–47.)   According to Lomax, Younger was not present when the comment was made, and Lomax did not report the incident to management, but he did discuss it with Younger.   (*Id*.)

•  With regard to discriminatory conduct, Younger testified that he either experienced or learned of three incidents involving disparate treatment of African-American employees during the course of his employment.   First, Younger testified about learning that an African-American forklift operator, Willy Durant, was required to take a drug test and two forklift tests after an accident, while a white forklift operator, Ken Fortenbury, was not required to undergo similar tests after an accident.   (Younger Dep. 76, 100, Page ID # 4615, 4639.)   Second, Younger claimed that in 2008, an African-American employee, Charles Lang, told Younger that unnamed individual(s) told him he was not allowed to use a certain bathroom because of his race and that if he continued to use it, he could be reprimanded or fired.   (*Id*. at 76–77, 97, Page ID # 4615–16, 4636.)   Third, Younger testified that on one occasion, his team leader, Charley Strassinger, denied him vacation time unfairly, while a white employee's vacation request was granted.   (*See Id*. at 74–75, Page ID # 4613–14; Younger Aff. ¶ 16, Page ID # 2216.)   Younger reported the matter to Parson, and Parson advised Younger that Strassinger should have approved the requested leave.   (Younger Dep. 75, Page ID # 4614.)   Ultimately, Younger was permitted to take the requested vacation time.   (*Id*. at 75, Page ID # 4614.)

- Finally, Younger broadly alleges having experienced problems with a number of co-workers and management personnel that are not overtly tied to race but that Younger believes resulted from race-based animus.  For example, Younger testified that like Parker, co-workers Rudy Orr and Ray Hensley sometimes sabotaged his work or gave him product of poor workmanship, causing him to have to work harder at his job.  (*Id*. at 29–31, Page ID # 4568–70.) With regard to management employees, Younger stated that Durbin made false accusations against him and did not grant him vacations as required by the CBA and that Privett required him to complete work within an unreasonable time-frame and would discipline him when he failed to meet the deadline.  (*Id*. at 37, Page ID # 4576.)  Younger also claims Privett denied him vacation time in retaliation for Younger calling the anonymous hotline about Privett viewing the KKK website, though Younger admits there is no evidence that Privett actually knew he made that anonymous complaint.  (*Id*. at 47, Page ID # 4586.)  Finally, Younger alleges Parson used profanity toward him, treated him unfairly when administering discipline, and threatened him with suspension or termination.  (*Id*. at 35–36, Page ID # 4574–75.)

- In connection with the above allegations, Younger does point to some corroborating testimony from co-workers.  For example, Lomax stated in his affidavit that he observed Younger frequently complain to both Parson and Privett that Privett disciplined African-American employees more harshly than white employees, and that as a result of Younger's complaints, Privett more closely scrutinized Younger's work for defects.  (Lomax Aff. ¶¶ 13–15, Page ID # 1100.)  Another co-worker, Darryl D. Floyd Jr., testified that Privett sometimes singled out Younger during team meetings.[22]  (D. Floyd Dep. 69–70, Page ID # 7476–77.)

---

[22]  Both Lomax and Floyd, as well as several other co-workers, testified in detail about their

The Court recognizes that this is a close case, and that the evidence to which Younger points is somewhat on the thin side, involving more of a spattering of isolated incidents of discrimination and infrequent derogatory remarks.   However, when viewed under the totality of the circumstances along with evidence of the persistent graffiti problem and the ongoing issues with Parker, which the evidence suggests may or may not have been caused by racial animus and which involved at least one potential threat of violence, the Court declines to rule as a matter of law that Younger has not suffered from a hostile work environment.   There is, additionally, at least some question of fact as to whether certain team leaders encouraged or condoned Parker's behavior in particular or a pervasive pattern of mistreatment of African-American employees in general.   Accordingly, the Court denies summary judgment to Defendant with respect to Younger's hostile work environment claim.

### 4.      Gillett

Gillett presented a somewhat more detailed account of ongoing harassment targeted toward him on the basis of his religion, and his case as a result is not as close as Younger's. Gillett did not advise Steelcraft of his religion when he was hired, but he did not hide his religion during the course of his employment, and some Steelcraft employees may have learned of Gillett's religion through casual conversation with him.   (Gillett Dep. 47, Page ID # 4709.)   The harassment that Gillett described appears to have begun sometime during the mid-2000s (*Id*. at 63, 70, Page ID # 4725, 4732), and includes the following:

- Gillett observed the same Graffiti as described by Younger.   (*See id*. at 74, 104, Ex. C–F,

own experiences with Privett, but there is no evidence that they discussed those experiences with Younger or that Younger was otherwise made aware of those experiences prior to the filing of this lawsuit.

H, Page ID # 4736, 4766, 4772–75, 4777.)   Gillett described the anti-Semitic graffiti as being "all over . . . the bathroom walls."   (*See id*. at 74, Page ID # 4736.)   In addition to the graffiti in the bathroom, a co-worker, Hensley, allegedly also had the image of a swastika on his truck and of a confederate flag on his locker.   (*Id*. at 82–83, Page ID # 4744–45.)

•     Gillett walked in on Parker and Privett viewing a KKK website during work, as described in detail above.   Related to that incident, Gillett also testified that Parker once claimed to be a member, possibly the treasurer, of the KKK.   (*Id*. at 72, Page ID # 4734.)   On another occasion, Parker allegedly told Gillett that if he ever saw Gillett or Younger outside of work, he would not acknowledge them because Younger is Black and Gillett is Jewish.   (*Id*. at 73–74, Page ID # 4635–36.)

•     Gillett admits that no Steelcraft management employee made any derogatory comments to him about his religion.   (*Id*. at 60–61, Page ID # 4722–23.)   However, he claims that unidentified co-workers placed signs on his back that stated "gay Jew, Jew f*g, stuff like that."   (*Id*. at 57, 62, Page ID # 4719, 4724; *see also* Gillett Aff. ¶ 7, Page ID # 2227.)   Gillett alleges that Busam, a Team Leader, saw the signs and sometimes removed them.   (Gillett Dep. 61, Page ID # 4723.)   Gillett also claims Busam told him, "I wish you'd stop putting these signs on your back."   (*Id*. at 77, Page ID # 4739.)

Consistent with Gillett's testimony, several other employees also observed the behavior described by Gillett.   Younger stated that on three or four occasions, he observed Parker place signs on Gillett's back reading "gay Jew," "F***ing Jew," and "Jewish f*g."   (Younger Aff. ¶ 19, Page ID # 2216; Younger Dep. 50–51, Page ID # 4589–90.)   Younger witnessed Gillett complain to Privett about the signs, and alleges Privett laughed at Gillett and walked away.   (*Id*. ¶ 20, Page

59

ID # 2216.) Younger also witnessed Gillett complain to Busam about the signs. (*Id.* ¶ 21, Page

ID # 2216.) According to Younger, Busam told Gillett to get back to work and to quit

complaining. (*Id.*)

Blue similarly recalled that when he worked with Gillett, he saw a sign on Gillett's back

that read "F***ing-Jew." (Blue Aff. ¶ 8, Page ID # 1104.) Blue also recalled seeing other signs

relating to Gillett's sexual-orientation rather than his religion. (Blue Dep. 60–61, Page ID #

6710–11.) In total, Blue estimated that he saw signs placed on Gillett's back on approximately

ten occasions. (*Id.* at 61–62, Page ID # 6711–12.) He witnessed Gillett complain to Busam

about both the comments and the signs. (Blue Aff. ¶ 9, Page ID # 1104.) Busam said he would

take care of it and told Gillett to get back to work. (Blue Dep. 63–64, Page ID # 6713–14.)

Steelcraft management then moved Gillett to a different area in the factory to try to put distance

between him and the co-workers causing him trouble. (*Id.* at 75–76, Page ID # 6725–26.)

Yet another co-worker, Geraldine Tucker, recalled people placing signs on Gillett's back

while they were under Busam's supervision, but she only recalled one sign referencing his

religion, a sign that said "gay Jew f*g." (Tucker Dep. 33, 61–62, 64, Page ID # 5899, 5927–28,

5930.)

Lomax witnessed similar conduct, though his testimony was inconsistent. In his affidavit,

Lomax described the conduct as follows:

> While working in the SUA line, I observed, on various occasions, that white
> employees were constantly laughing at Mr. Gillett because various signs were
> constantly placed on Lee Gillett's back by other employees. I observed that such
> signs, read "Fucking Jew." On several occasions, I observed that Mr. Gillett
> complained to Mr. Jeff Privett – that Mr. Gillett was being targeted for ridicule by
> white-employees because of his Jewish heritage. I noticed that Mr. Privett never
> reprimanded any white-employee for ridiculing Mr. Gillett for his Jewish faith and
> heritage.

(Lomax Aff. ¶ 8, Page ID # 1099.)   During his deposition, Lomax testified that he actually saw signs on Gillett's back only two or three times.   (Lomax Dep. 111–12, Page ID # 7254–55.) Lomax recalled that the signs referenced "kick me," Gillett's sexual orientation, and his religion. (*Id*.)   He confirmed witnessing Gillett complain at least twice about the signs.   However, contrary to what he stated in his affidavit, he admitted that he had seen Privett tell the employees to stop and that he did not actually know the extent of Privett's full response.   (*Id*. at 114–15, Page ID # 7257–58.)

•      Gillett testified that, in addition to posting signs on his back, all of the Union employees in his work area, with the exception of Younger and one other employee, regularly made negative statements regarding his religion, such as calling him "f\*g Jew."   (Gillett Dep. 61, Page ID # 4723.   *See also* Blue Aff. ¶ 8, Page ID # 1104 (describing the same); Mason Aff. ¶ 12, Page ID # 1119 (same)).   In addition to the name-calling, a Union co-worker, Jeremy Jester, once said something to Gillett along the lines of "my daddy made a coat out of your daddy." (Gillett Dep. 75–76, Page ID # 4737–38; Younger Dep. 51, Page ID # 4590.)

•      In his affidavit, Gillett stated that the above-described "ridicule" often took place in front of Busam and Privett.   (Gillett Aff. ¶ 7, Page ID # 2227.)   He claims Busam sometimes laughed at the behavior.   (*Id*.)   Furthermore, he claims Busam and Privett did nothing to stop the behavior or to reprimand those responsible, despite his complaints.   (*Id*.)   Gillett alleges that he called the anonymous hotline "10, 20, 30 times" about "Jew harassment," but to his knowledge no action was taken.   (Gillett Dep. 56, 80, Page ID # 4718, 4742.)   Though he claims to have made such complaints, he could not recall the specific details or allegations of the complaints he made.   (*Id*. at 102–103, Page ID # 4764–65.)

61

- A co-worker, Ricardo Johnson, testified that he once observed Privett give Gillett a written warning notice for abuse of company time because Gillett went to the bathroom.   (Johnson Aff. ¶ 9, Page ID # 1127.)   He claims Privett did not give other white employees written warnings when they went to the bathroom, but he does not indicate what the religion of those employees may have been.   (*Id*.)   During his deposition, Johnson further explained that Gillett received the written warning on one occasion when he was not meeting production targets and Privett thought he had spent too much time on a bathroom break.   (Johnson Dep. 60–61, Page ID # 7099–100.)

- Gillett testified to several incidents involving destruction of his property or the sabotaging of his work.   For example, a co-worker once placed a dead rat in his peanut jar during work. (Gillett Dep. 78–79, 4740–41.)   That incident was witnessed by at least one employee.   (*See* Tucker Dep. 30, Page ID # 5896.)   Gillett also stated that unnamed individuals sometimes stole his tools and other items from his locker.   (Gillett Dep. 77, 79, 89–90, Page ID # 4739, 4741, 4751–52.)   On one occasion someone painted his locker pink and welded it shut, and on another occasion, one of his co-workers threw his locker in a garbage bin.   (*Id*. at 82, Page ID # 4744.)

Gerald Fannon, a co-worker, testified that some employees had placed putty on Gillett's tools, welded his locker shut, and put a rat or mouse in his locker.   (Fannon Dep. 35–36, Page ID # 6152–53.)   At one point Gillett complained to Fannon that he was being harassed during Privett's watch.   Fannon testified that Gillett brought the harassment to Privett's attention.   (*Id*. at 43–44, Page ID # 6160–61.)

Johnson similarly alleged that unnamed individuals sabotaged Gillett's work product by poorly welding the products prior to transferring them to Gillett.   As a result, Johnson maintains, Gillett was forced to repair the welds and was unable to meet his daily quota.   Though Gillett

62

complained to Privett about work sabotage, Privett gave Gillett written warnings for "abuse of company time" for taking too long to complete his work product. (Johnson Aff. ¶ 8, Page ID # 1127.)

- Finally, Johnson claims to have witnessed Parker threaten to beat up Gillett in the work place. (*Id.* ¶ 11, Page ID # 1127.)

The evidence viewed in a light most favorable to Gillett indicates that he repeatedly was the target of harassment based on his religion, that the offensive behavior was allowed to continue unabated, and that several individuals witnessed these incidents, lending further credibility to Gillett's testimony. There is a question of fact as to the frequency of these events, but there is sufficient evidence from which a jury could infer that the harassment amounted to more than merely a few isolated occurrences. Added to that evidence is Gillett's observation of Parker and Privett viewing a KKK website while at work, the anti-Semitic Graffiti, Parker's threat of physical violence, and the destruction of Gillett's property and damage to his work product.

Such evidence is sufficient to defeat Steelcraft's motion for summary judgment. Arguably Gillett presents an even stronger case than did Younger. The harassment he describes was pervasive and ongoing and that seemed to permeate his day to day work experience to such an extent as it would not be impossible for a jury to conclude that it altered the terms and conditions of his employment.

The Court therefore denies summary judgment to either Plaintiffs or Defendant as to Plaintiffs' hostile work environment claims.

## D. **Retaliation**

In contrast to Plaintiffs' discrimination claims, the basis for and nature of Plaintiffs' retaliation claims are clearly spelled out in Plaintiffs' Complaint. Specifically, Plaintiffs allege

that Steelcraft "retaliated against Plaintiff Younger by suspending him; and, retaliated against Plaintiff Gillett by terminating his employment."[23]   (Complaint ¶ 16, Page ID # 21.)

The same burden shifting framework that applied to Plaintiffs' disparate treatment claims also applies to Plaintiffs' retaliation claims.   First, each Plaintiff must prove a prima facie case of discrimination.   If they succeed, the burden shifts to Defendant to provide a legitimate nondiscriminatory reason for the adverse employment action.   The burden then shifts back to Plaintiff to prove pretext.  *See Welsh v. Automatic Data Processing, Inc.*, 1:12CV228, 2013 WL 3155773, at *5–6 (S.D. Ohio June 20, 2013).

To establish a prima facie case of retaliation, Plaintiffs must demonstrate that (1) they engaged in activity protected by Title VII; (2) Defendant knew of their exercise of their protected rights; (3) the defendant subsequently took an adverse employment action against Plaintiffs; and (4) there was a causal connection between Plaintiffs' protected activity and the adverse employment action.  *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).

The Court's analysis of Plaintiffs' retaliation claims mirrors that of their disparate treatment claims.   In other words, even assuming that Younger can establish a prima facie case of retaliation with respect to his suspensions and that Gillett can prove a prima facie case with respect to his termination, Defendant has articulated a legitimate nondiscriminatory reason for both adverse actions, and Plaintiffs fail to prove pretext.   In short, there is no evidence that Parson's

---

[23]   The Sixth Circuit has recognized that "[r]etaliatory harassment by a supervisor is actionable in a Title VII case." *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000).   While such a claim might seem a natural fit for a case like this, Plaintiffs did not allege that Defendant retaliated against them by subjecting them to severe and pervasive harassment, as they would have had to do to state a retaliatory harassment claim.   Rather, as noted above, Plaintiffs allege that Defendant retaliated against then by taking concrete, isolated, disciplinary actions.   The Court's analysis therefore is limited to the claims alleged.

decision to impose Younger's suspensions or that the decision to terminate Gillett based on his poor attendance was caused by any retaliatory motive.   Accordingly, the Court grants summary judgment to Defendant as to Plaintiffs' retaliation claims.

## IV.     CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Strike Plaintiffs' Harassment Claim (Doc. 61) and **DENIES AS MOOT** all other motions to strike (Docs. 69, 70, 78, and 82.)   The Court also **DENIES** Plaintiffs' Motion for Summary Judgment (Doc. 56) and **GRANTS** summary judgment to Defendant as to all of Plaintiffs' claims except for Plaintiffs' hostile work environment claims.

IT IS SO ORDERED.


S/Susan J. Dlott                                         
Chief Judge Susan J. Dlott
United States District Court